NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

CLARENCE E. SCOTT,                                  :
                                                    :     Civ. No. 11-3365 (SRC)
                        Petitioner,                 :
                                                    :
        v.                                          :     **OPINION**
                                                    :
GREG BARTKOWSKI, et al.,                            :
                                                    :
                        Respondents.                :
_____             :

**STANLEY R. CHESLER, U.S.D.J.**

## I.     INTRODUCTION

Petitioner is a state prisoner and is proceeding *pro se* with a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of multiple counts

including murder, armed robbery, attempted murder, resisting arrest and weapons charges,

amongst others.  He is currently serving a sentence of 115 years with sixty-nine years of parole

ineligibility.  Petitioner raises fifteen claims in his habeas petition, challenging evidentiary

rulings by the trial court, the jury instructions, prosecutorial misconduct and other trial-focused

claims.  In addition, Petitioner claims that both his trial and appellate counsel were ineffective.

For the following reasons, the habeas petition will be denied.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

The murder occurred in the Christopher Columbus Housing
Projects (CCP) in Paterson, on January 27, 1998, at approximately
11:30 p.m.  Joseph Robinson testified that he and Alphonso Lee
were leaving Building One at CCP when they encountered an
armed man just outside the door.  Robinson described the man as

_____

[1] The factual background is taken from the Superior Court of New Jersey, Appellate Division
opinion on petitioner's direct appeal that was decided February 2, 2006.  (*See* Dkt. No. 24-31.)

wearing a black jacket made of leather or goose down, a dark hat, and a dark-colored scarf wrapped around his head. Robinson could not see the man's face because it was covered by the scarf. He recalled that the gun, which he saw at close quarters, looked like a .9 millimeter pistol. Because Robinson assumed that the gunmen intended to rob them, he handed over his money, knelt down on the floor, and looked down rather than up at the gunman. From that vantage point, he saw the gunman's boots, which he described as black with yellow trim. Nine days after the robbery, Robinson gave a statement to police and identified a photograph of the boots that defendant was wearing when arrested as being the boots the gunman was wearing.

At trial Robinson testified that the gunman remarked that he knew Robinson and handed him back his money. Robinson also testified that he was acquainted with the defendant, although the gunman had a raspy voice that did not sound like defendant's voice. As the gunman walked away, Robinson observed that he walked with a limp.

Robinson, and several other witnesses, testified that as the gunman walked away from Building One, a group of people standing near Building Two, which was across the courtyard, began shouting taunts at him, calling him a "fag" and threatening that "we'll F you up" if he approached them. Shortly thereafter, Robinson heard a shot and saw the gunman walking away from the Projects toward nearby Matlock Street.

Raysun Belton, who was standing near Building Two with Ronald Wimbush, testified that his friend, "Jayvon," had walked over to Building One and returned within seconds exclaiming that there was a "stickup" going on and that the gunman had two people down on the floor. After the gunman emerged from Building One, Belton heard someone behind him shout to the gunman "don't come down here . . . we'll fuck you up." Upon seeing the gunman reach down, Belton began to run away, believing that he was reaching for a gun. Belton then heard a gunshot, and saw Ronald Wimbush, staggering and holding his neck. Belton confirmed that the gunman was dressed in dark clothing and walked with a limp. Belton ran to find a policeman to report the shooting. He reported to the officer that the gunman was wearing black clothing and had a "funny walk" as though something was wrong with his foot or leg. At trial, Belton demonstrated the gunman's distinctive walk to the jury. It was described for the record as "[s]o you are indicating your feet spread apart and your shoulders bobbing back and forth, going up and down."

Kelwanna Curry testified that she was standing in front of Building Two when she saw a person with a gun come towards her. From fifteen feet way [sic], she observed that the gunman was wearing a dark hat, a black scarf wrapped around his face and a black jacket. She testified that Ronald Wimbush, also known as "Issa," was standing near her. She saw the gunman come up to Wimbush, who said "I didn't say anything." She saw the gunman grab Wimbush. Then she turned and ran into Building Two. As she was running away, she heard a shot.

Officer Frank Ferrigno testified that he was on patrol on the night of the shooting when he received a broadcast from headquarters concerning a shooting at CCP and a description of a suspect who was wearing blue jeans, a black jacket, and a red and black scarf, and was limping. The suspect was reported as heading toward School 28. On Jefferson Street, he spotted a black man wearing clothing that fit the broadcast description. Ferrigno described the man as wearing a black jacket but having it partially off his right shoulder as though he were trying to take it off. When Ferrigno ordered the man to stop, he began running away. At that point, Ferrigno noticed that the man had a limp. Ferrigno and his partner, Officer Salvatore Giuliana, gave chase, and were able to apprehend the man as he was attempting to climb over a fence at the end of an alley.

The individual, later identified as Clarence Scott, violently resisted arrest. Ferrigno described him as fighting, swinging, punching, kicking and biting in his attempt to get away. Ferrigno testified that at one point during the struggle to handcuff him, Scott reached into the pocket of the black leather jacket. Believing he might be reaching for a gun, Ferrigno also placed his own hand into the jacket pocket, where he felt the gun. He testified that Giuliana was at the suspect's feet, and that during the struggle, the suspect was pointing the gun at Giuliana, through the jacket pocket. Ferrigno was able to get the gun away from the suspect, and he and his partner handcuffed him. He testified that Scott was upset and aggressive, cursing the officers and stating "F, you cops, you should have killed me, should have shot me." When brought to the police station, defendant further threatened "to kill all you officers, you mother fuckers, I'll get you." Ferrigno's testimony was corroborated by Detective Vogt, who testified that he was on duty at the police station when Scott was brought in and that Scott threatened to "kill all us fucking cops."

When apprehended in the alley near Jefferson Street, defendant was wearing a black leather jacket and a dark wool scarf. During a search of the area, conducted later that night, police found a black wool hat on Jefferson Street.

Derrick Wright, a nurse at the Passaic County Jail where defendant was held pending trial, testified that he has seen defendant walk many times and, while he does not walk with a limp, he walks with a "swagger." Like Belton, Wright demonstrated the walk to the jury. Counsel and the court described the walk for the record as follows: "[I]t appeared that Mr. Wright walks in a way in which he appeared to . . . at the end of each . . . step dipped his right shoulder. . . . The upper torso shifted from side to side and one leg drops." Wright also testified that he observed defendant taking a shower in order to document any injuries he might have when he was brought into the jail. He saw no bruises or other injuries, and defendant did not complain of any injuries.

Officer Sean Reed testified that he responded to a report of a shooting. At the murder scene, in front of Building Two, he found a shell casing from a bullet. The State presented expert ballistics testimony confirming that the shell had been fired from the gun found in defendant's black leather jacket. The state also presented testimony that when defendant was apprehended, the gun, a .9 millimeter pistol, had a bullet jammed in the chamber. The magazine, which had a capacity of eight bullets, contained two ordinary bullets and two Hollowpoint bullets.

The State also presented testimony from Raymond Simmons concerning an alleged confession that defendant made to him while they were both housed in the Passaic County Jail. According to Simmons, defendant told him that he was "out to make some money . . . at the CCP projects and he went to stick this guy up and . . . he shot him." Simmons testified that defendant told him he shot "Issa-Char" (Wimbush), because "he refused to give him his money or whatever he had to give him and that's when he shot him." He also testified that defendant told him that he did not intend to let the police arrest him "but the gun was jammed."

At the time of the alleged confession, Simmons was in jail on burglary charges. After he pled guilty but before he was sentenced, he wrote a letter to the Prosecutor's Office offering to provide information about the murder. But at defendant's trial Simmons denied that he was motivated by any desire to obtain a lighter sentence. According to Simmons, Wimbush was a friend of his and he was offering information to the Prosecutor from purely

altruistic motives, to help Wimbush's family.  In his summation, even the State's attorney conceded that this testimony was not credible.  Further, Simmons admitted that he and another trial witness, Wilfredo Izquierdo, were co-defendants in the burglary case, and that he and Izquierdo had been co-defendants several times in the past on charges of burglary, stolen cars and robbery.

The defense called Izquierdo as a witness to rebut Simmons' testimony.  Izquierdo testified that he, Simmons, and defendant, were all incarcerated at the Passaic County Jail at the same time.  But he testified that the three of them were assigned to different sections of a large dormitory, and, to his knowledge, defendant and Simmons had no relationship with each other.  He testified, however, that Simmons told him that he was going to offer the Prosecutor information about defendant in order to try to "get his time back," that is, to get a reduction in his sentence.  Izquierdo testified that Simmons engaged in "jailhouse snitching" and that he believed that Simmons also informed on him in connection with the burglary.

During direct examination, defense counsel asked Izquierdo if he was aware of Simmons' reputation in the community for truthfulness, a question the prosecutor later conceded was proper under N.J.R.E. 608.  Rather than answering the question "yes" or "no," Izquierdo responded that Simmons was the "[b]iggest liar I ever knew."  The prosecutor objected.  The trial judge sustained the objection but also noted, erroneously, that the question was an improper question.  Defense counsel did not object to the ruling or request a sidebar conference to discuss it.  [FN 3]  Rather he asked another question, concerning whether the witness had "had any experience personally with Mr. Simmons where you formed an opinion as to whether he was telling the truth or lying?"  The court sustained the State's objection to this question.  Although Izquierdo was not permitted to testify about Simmons' community reputation for truthfulness, he was permitted to testify that Simmons had a history of burglary convictions.  Izquierdo also admitted to his own history of convictions for burglary, receiving stolen property and theft.

[FN 3] Prior to trial, the judge had instructed counsel to come to sidebar if they wished to make an objection requiring more than one or two words (e.g. "leading.") or if they wished to discuss an objection.

Significantly, Simmons' testimony was the only evidence supporting the charge that defendant committed robbery against

Wimbush, and it was the only evidence supporting the charge of felony murder, which was premised on the assertion that defendant shot Wimbush during the course of a robbery. The jury acquitted defendant on both of those charges.

Defendant testified that he was in the general vicinity of the CCP projects on the night of the murder, but he denied robbing Joseph Robinson or killing Wimbush. He testified that he was wearing a yellow leather jacket that night, but that he lost the jacket. He testified that a woman named Karen Reid gave him a ride to the vicinity of Jefferson Street and North 3rd Street. Since it was hot in her car, he took his jacket off. As she stopped to let him out of the car, they were having an argument, and she abruptly drove off with his jacket still in her car. Defendant testified that he met some friends at North 3rd Street, talked to them for a while and then headed to a bar to buy some cigars. As he walked toward the bar, a man dressed in dark clothing ran past him and, as he ran, he threw something. When defendant walked over to see what the man had discarded, he found a black leather jacket. Although he had no coat on this January night, defendant did not put on the jacket. Rather, he slung the jacket over his shoulder and walked in the direction of his sister's house on North 3rd street, intending to put the jacket away and give it to one of his friends later. Suddenly, he was accosted by police. He testified that he ran from them because he had an outstanding violation of probation and did not want to be apprehended. Defendant denied that there was a gun in the jacket or that he ever attempted to shoot either officer. He admitted cursing at the police but contended that he did not threaten to kill them. He testified that he threatened to sue them for brutality, because they kicked him in the side and in the groin and dragged him to the police car.

Defendant admitted that he might have been wearing the hat that the police found on Jefferson Street, and he admitted that on that night, he was wearing black Columbia brand boots with a yellow logo. But he denied ever wearing a scarf, although he was photographed wearing one in the mug shot taken the night of his arrest. At the prosecutor's request, defendant tried on the black leather jacket during the trial. He was able to put it on, but he claimed that it did not fit him because the sleeves were too short. During his summation, the prosecutor, who contended that he was approximately the same build as defendant, also tried on the jacket in an attempt to demonstrate that if he held his arms in the same posture as defendant had when he claimed the sleeves were too short, the sleeves would naturally ride up on his arms, although

they were not too short when he stood naturally.  Plaintiff's
counsel did not object.

The jury returned a verdict of guilty on all charges other than the
robbery of Wimbush and the felony murder of Wimbush.  As the
jury was announcing its verdict on the first thirteen charges,
defendant began screaming and cursing and, as a result, the judge
ordered that he be removed from the courtroom.  Based on
defendant's unruly conduct, including a scuffle with Sheriff's
officers outside the courtroom, the judge did not have defendant
brought back into the courtroom when he charged the jury on the
last charge, (possession of a weapon by one not lawfully permitted
to possess a weapon), nor during the verdict on that charge.

(Dkt. No. 24-31 at p. 2-13.)

After petitioner was convicted and sentenced, he appealed to the Superior Court of New

Jersey, Appellate Division.  The Appellate Division affirmed on February 2, 2006.  (*See id.*)

Petitioner then filed a petition for certification to the New Jersey Supreme Court.  On June 5,

2006, the New Jersey Supreme Court granted the petition for certification, "solely to defendant's

sentences on Count 5 (robbery) and Count 8 (attempted murder)" and remanded the matter only

on those issues for resentencing in light of *State v. Natale*, 184 N.J. 458, 878 A.2d 724 (2005).

*See State v. Scott*, 901 A.2d 951 (N.J. 2006).

Petitioner then filed a petition for post-conviction relief in the Superior Court of New

Jersey, Passaic County.  (*See* Dkt. Nos. 24-32, 24-33.)  That court denied the petition for post-

conviction relief on September 12, 2008.  (*See* Dkt. No. 24-34.)  Petitioner appealed that order to

the Appellate Division.  (*See* Dkt. No. 24-35.)  The Appellate Division affirmed the denial of the

petition on August 3, 2010 in a written decision.  (*See* Dkt. No. 24-38.)   Subsequently, the New

Jersey Supreme Court summarily denied certification on February 15, 2011.  (*See* Dkt. No. 24-

39.)

Petitioner initiated this federal proceeding by filing a petition for writ of habeas corpus on June 10, 2011. (*See* Dkt. No. 1.) On October 6, 2011, the Court dismissed the petition without prejudice due to petitioner's request to submit a properly completed petition and brief. (*See* Dkt. No. 7.) Petitioner filed another petition for writ of habeas corpus on November 7, 2011. (*See* Dkt. No. 8.) However, on January 5, 2012, the Court dismissed that petition without prejudice as well as it was not filed on the proper form. (*See* Dkt. No. 10.)

On February 9, 2012, petitioner filed another federal habeas petition. (*See* Dkt. No. 14 (hereinafter "Pet.").) This is the petition upon which the Court rules. Respondent answered the petition and filed exhibits in opposition. (*See* Dkt. Nos. 24, 27.) Petitioner filed a traverse and motion for an evidentiary hearing on January 14, 2013. (*See* Dkt. Nos. 28, 29.)

## III. HABEAS CORPUS LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, - U.S. -, 131 S. Ct. 1388, 1398 (2011). The petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.*

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has

denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, - U.S. -, 131 S. Ct. 770, 784-85 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

## IV.    DISCUSSION

Petitioner raises fifteen claims in the instant federal habeas petition; specifically:

1. Trial court error in precluding trial counsel from introducing evidence to attack the credibility of the state's chief witness;

2. Improper admission of petitioner's post-arrest bad acts;

3. Trial court error in omitting an identification jury instruction;

4. Trial court error in failing to instruct the jury on lesser included offenses of aggravated manslaughter and reckless manslaughter;

5. Excluding petitioner from trial violated his right to be present at every stage of his trial;

6. Petitioner's constitutional right to be present at every stage of his trial was violated when petitioner and his trial counsel were absent when a jury request was examined and ruled on by the trial judge;

7. Ineffective assistance of trial counsel for failing to move for a severance;

8. Petitioner was deprived his right to a public trial;

9. Petitioner's Confrontation Clause right was violated when the trial court admitted the hearsay statements of a non-testifying witness;

10. Ineffective assistance of trial counsel by: (i) not requesting a jury charge of lesser included offenses of aggravated manslaughter and reckless manslaughter; (ii) not requesting a lesser included offense jury charge of attempted theft; (iii) failing to file a

motion to dismiss the indictment; (iv) not investigating or preparing the case; (v) not requesting a curative instruction after introduction of testimony that the trial judge had ruled was too prejudicial; (vi) failing to challenge the State's decision not to call one alleged victim of the attempted murder as a witness; (vii) not objecting to the exclusion of members from the public from petitioner's trial; (viii) not providing petitioner with ballistic reports or discovery;

11. Petitioner's right to confront the victim of the attempted murder charge at trial was violated;

12. Insufficient evidence to convict petitioner for robbery;

13. Prosecutorial misconduct;

14. Trial court error in failing to voir dire jurors to determine whether extraneous matters influenced the jury's verdict and petitioner's right to a fair trial; and

15. Ineffective assistance of appellate counsel.

These claims are considered in turn.

A. Claim I – Excluding Izquierdo's Testimony

In Claim I, petitioner argues that the trial court improperly precluded his trial counsel from introducing evidence to attack the credibility of a prosecution witness, Simmons, through the testimony of Wilfredo Izquierdo. As discussed in Part II, *supra*, Simmons' testimony included petitioner's purported statements to him while both were incarcerated in the Passaic County Jail. This testimony included the events surrounding the killing of Wimbush and the purported robbery of Wimbush as well. (*See* Dkt. No. 24-14 at p. 2.)

Petitioner called Izquierdo as a witness and attempted to use Izquierdo to attack

Simmons' credibility; specifically, the following colloquy took place at trial on direct of

Izquierdo:

> Q:  You've known Mr. Simmons a while?
> A:  About 25 or better.
> Q:  Are you aware by virtue of that, of his reputation in the community for being truthful?
> A:  Biggest liar I ever knew.
> [PROSECUTOR]:  Objection to that.
> THE COURT:  I don't know why – objection sustained.  There was an answer – that's an improper question.  But the jury will disregard the answer to the question.
> Q:  Have you had any experience personally with Mr. Simmons where you formed an opinion as to whether he was telling the truth or lying?
> [PROSECUTOR]:  That's an objection –
> THE COURT:  Sustained.

(Dkt. No. 24-17 at p. 19.)

The last reasoned state court decision on this claim was from the Appellate Division on

direct appeal.  The appellate court acknowledged that the trial court erred in ruling that defense

counsel's question was improper:

> Defendant correctly contends that the trial judge erred in ruling that his counsel's question to Izquiredo [sic] concerning Simmons' reputation for truthfulness was an improper question.  As the prosecutor later conceded in colloquy after the trial testimony was concluded, the question was proper under N.J.R.E. 608.  *See State v. Guenther*, 181 N.J. 129, 140 (2004).  But Izquierdo's answer was non-responsive and inadmissible because he gave his personal opinion that Simmons was a liar, instead of stating whether or not he knew of Simmons' reputation in the community.  *Ibid.*  Thus the prosecutor's objection was properly sustained.  Rather than sua sponte remarking that the question was improper, the court should have stricken the answer as non-responsive and permitted defense counsel to pose the question again, clarifying for the witness that he should answer it yes or no.

(Dkt. No. 24-31 at p. 15.)

Nevertheless, the Appellate Division concluded that the trial court's error was harmless because "in the context of this trial, there is no possibility that this ruling could have affected the outcome." (*Id.* at p. 15-16.) In reaching this conclusion, the Appellate Division relied on the following language from the New Jersey Supreme Court decision in *State v. Bankston*, 63 N.J. (1973):

> The test of whether an error is harmless depends upon some degree of possibility that it led to an unjust verdict. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached. [*Id.* at 273.]

(Dkt. No. 24-31 at p. 16.) Applying this principle to the facts at hand, the appellate court further reasoned:

> We perceive little likelihood that the jury would have attached weight to the testimony of one convicted burglar concerning the community reputation for truthfulness of another convicted burglar. Moreover, the defense was able to elicit far more damaging testimony concerning Simmons' credibility in the form of his lengthy history of crimes of dishonesty. And even the prosecutor admitted, in his summation, that portions of Simmons' testimony were incredible. Further, the jury evidently did not believe Simmons' testimony, because they acquitted defendant on the two charges – robbery of Wimbush and felony murder – as to which Simmons' testimony was the only evidence. Finally, the State presented overwhelmingly strong circumstantial evidence of defendant's guilt on all of the other charges. Defendant was apprehended in the area toward which witnesses told the police the killer had fled; he was caught with the murder weapon in his possession; dressed in the black jacket and black-and-yellow boots that witnesses testified the killer was wearing, and walking with the limp which the witnesses said was characteristic of the killer's gait.

(*Id.* at p. 16-17.)

This claim is not cognizable on federal habeas review to the extent petitioner asserts that the state court's evidentiary ruling violated state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68

(1991) (stating that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions"). The due process inquiry that is applicable to this claim is whether the state court's ruling was so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (noting that to show that an evidentiary error rises to the level of a due process violation, a petitioner must show "that it was of such magnitude as to undermine the fundamental fairness of the entire trial"). The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

As illustrated above, the appellate court found that the trial court erred in ruling that counsel's question to Izquierdo concerning Simmons' reputation for truthfulness was an improper question. Nevertheless, the state court determined that any such error was harmless.

Under the applicable harmless error test, a habeas petitioner must demonstrate constitutional error that resulted in "actual prejudice" in order to obtain relief from a federal court; which asks whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Eley v. Erickson*, 712 F.3d 837 (3d Cir. 2013) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)). Indeed, the Supreme Court has stated that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, *supra*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*], 386 U.S. 18 [1967]." *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *see also Bond*, 539 F.3d at 275-76 ("*Fry* instructs use to perform our own harmless error analysis under *Brecht* . . . rather

than review the state court's harmless error analysis under the AEDPA standard.")  In reviewing the record, if a federal habeas court is in "grave doubt" as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict, then the error was not harmless.  *See Adamson v. Cathel*, 633 F.3d 248, 260 (3d Cir. 2011) (citing *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995)).

Assuming *arguendo*, that the trial court's error amounted to a constitutional violation, any purported error was harmless.  First, as noted by the Appellate Division, while the trial court sustained objections as to Izquierdo's testimony regarding Simmons' reputation for truthfulness, petitioner's trial counsel elicited Simmons' lengthy history of dishonesty.  For example, Simmons admitted at trial that he previously used fake names to try and deceive the police when he was arrested in the past.  (*See* Dkt. No. 24-14 at p. 10.)  Simmons also admitted that he had been arrested six or seven times in his life and that, at the time he was in jail with petitioner, he was incarcerated on a burglary charge.  (*See id.* at p. 8, 10.)  Thus, the jury was well aware of Simmons' history of dishonesty even without hearing Izquierdo testify as to Simmons' reputation for truthfulness.    Additionally, Simmons' testimony was the sole evidence implicating petitioner in the robbery of Wimbush.  (*See id.* at p. 2.)  However, the jury returned a verdict of not guilty on the Wimbush robbery and the corresponding felony-murder count.  This illustrates that the jury did not believe Simmons' testimony in the first place.

For these reasons, the trial court's error in not allowing Izquierdo testify as to Simmons' reputation for truthfulness was harmless.  The preclusion did not have a substantial and injurious effect on the jury's verdict.  Therefore, this claim does not merit federal habeas relief.

B. Claim II – Post-Arrest Bad Acts

In Claim II, petitioner contends that the trial court erred by admitting petitioner's post-arrest bad acts which included threatening to kill police officers and that the trial court should have given the jury a limiting instruction.  Petitioner argues:

> The State, over defense objection, elicited testimony from Officer Ferrigno that Petitioner had acted in a [t]hreatening and menacing manner after he was arrested.  Specifically, Officer Ferrigno testified that after petitioner was arrested, he became aggressive and threatening, yelling "f, you cops, you should have killed me, should have shot me."  In addition, according to Officer Ferrigno, petitioner, while on the way to the police station, continued to make hostile remarks, repeatedly screaming "fuck you" to the officer.  Ferrigno also testified that petitioner continued this "abusive language" after they arrived at the police station.  Specifically Ferrigno testified that at the police station, petitioner threatened, "you should have killed me because when I get out I'm going to kill all you officers, you mother fuckers, I'll get you.  Officer Robert Vogt also testified at trial about the threatening remarks made by petitioner at the police station.
>
> The trial court allowed this evidence, concluding that petitioner's post-arrest bad acts were admissible because they demonstrated that petitioner was angry.  And the trial court admitted this evidence without explaining to the jury the exact purpose for which this evidence was admitted – and that the jury should not presume from this evidence that petitioner had a criminal propensity and that he acted in accordance with that criminal propensity by committing the crimes charged.

(Pet. at p. 9-10.)

The Appellate Division, on direct appeal, analyzed this claim under the New Jersey Rules of Evidence:

> We likewise find no merit in defendant's contentions concerning the inadmissibility of his post-arrest statements to the police.  N.J.R.E. 404(b), which prohibits the admission of evidence of bad acts or other crimes committed on other occasions to prove that defendant committed the acts with which he is currently charged, does not pertain to bad acts which are part of the res gestae or components of the crimes with which defendant is charged.  N.J.R.E 404(b); *State of Martini*, 131 N.J. 176, 240-42 (1993), *overruled on other grounds by*, *State v. Fortin*, 178 N.J. 540, 632-

633 (2004); *State v. Cherry*, 289 N.J. Super. 503, 522 (App. Div. 1995). In this case, defendant's cursing and his statements that the police should have shot him were relevant to the charge of resisting arrest, since they demonstrated that defendant intended to avoid arrest at all costs. His threats to kill the police were likewise relevant to the charge of attempted murder of Officer Giuliana. This evidence supports an inference that when defendant and [O]fficer Ferrigno were struggling over the gun, defendant was intending to shoot Ferrigno's partner, Officer Giuliana. The evidence of defendant's angry, aggressive and irrationally violent state of mind for a very short time after the murder is also relevant to explain the murder itself. According to witnesses, the only apparent motive for shooting Wimbush was that the killer thought Wimbush had been taunting or insulting him. Defendant's demonstrated emotional state near the time of the murder was consistent with that of someone who would shoot another person over an insult.

(Dkt. N. 24-31 at p. 17-18.)

As previously described, to prevail on a habeas claim based on a state court's evidentiary decision, the issue is whether the state court's ruling was so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano*, 512 U.S. at 12-13; *see also Keller*, 251 F.3d at 413. As noted by the Appellate Division, petitioner's actions after his arrest were relevant to the charges levied against him. Indeed, one of the counts against petitioner was for attempted murder of Officer Giuliana. The admission of this evidence was relevant to the charges brought against petitioner. Hence, the state court's adjudication of this Claim was not an unreasonable application of clearly established federal law.

Petitioner also claims that the trial court should have instructed the jury not to presume that petitioner had acted in accordance with his post-arrest actions of cursing and threatening the police officers. Petitioner raised this issue on direct review and the Appellate Division denied it without discussion.

Generally, claims involving jury instructions in state criminal trials are matters of state law and are cognizable only if the instructions are so fundamentally unfair that they deprive a petitioner his rights to a fair trial and due process. *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). A petitioner's burden is "especially heavy" when the claim involves a failure to give an instruction as "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155. *See Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (noting that due process is violated when "the instruction contained some ambiguity, inconsistency, or deficiency," and "there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.") (internal quotation marks omitted).

Petitioner contends that the testimony of his post-arrest tirades was only propensity evidence. However, this type of evidence also went to petitioner's state of mind. Petitioner was charged with attempting to murder Police Officers Ferrigno and Giuliana during the course of his arrest. Therefore, his statements of anger and threats to the officers after his arrest were relevant to those charges. Accordingly, the state court's denial was not an unreasonable application of clearly established federal law. The failure to give a limiting instruction did not render the trial so fundamentally unfair that it deprived petitioner of his constitutional rights to due process and a fair trial.

For the foregoing reasons, Claim II will be denied.

C. Claim III – Identification Jury Instruction

In Claim III, petitioner asserts that the trial court erred in failing to *sua sponte* issue an identification jury instruction. He claims that mistaken identity "was clearly the defense strategy

at trial." (Pet. at p. 11.) The Appellate Division, on direct review, analyzed this claim as follows:

> Likewise we find no merit in defendant's argument, raised for the first time on appeal, that the trial judge should have given the jury an identification charge. Defendant's counsel did not request an identification charge, and the charge was not required in light of the evidence presented at trial. None of the witnesses to the murder saw defendant's face and none of them identified defendant as the killer. Moreover, defendant's identity at the arrest scene was not in issue. He admitted that he was the person who fled from the police and whom they subsequently arrested.

(Dkt. No. 24-31 at p. 18.)

A claim related to jury instructions must infect the entire trial in order to establish a due process violation. *See Estelle*, 502 U.S. at 72; *Henderson*, 431 U.S. at 154. "'A defendant is entitled to a theory of defense instruction if (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of defendant's theory would deny him a fair trial.'" *United States v. Hoffecker*, 530 F.3d 137, 176 (3d Cir. 2008) (quoting *United States v. Wren*, 363 F.3d 654, 664 (7th Cir. 2004), *vacated on other* grounds, *Yarbor v. United States*, 543 U.S. 1101 (2005)).

The failure of the trial court to *sua sponte* issue an identification instruction did not so infect the trial to make it become fundamentally unfair. The United States Supreme Court has stated that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citations omitted). Under New Jersey law, "when identification is the crucial issue in the case, the defendant is entitled to a discrete and specific instruction, providing 'appropriate guidelines' and 'focusing the jury's attention on how to analyze and consider the fact issues with regard to the trustworthiness of [the

eyewitness's] in-court identification.'" *State v. Mojica*, No. A-3320-09T3, 2012 WL 1672882, at

*3 (N.J. App. Div. May 15, 2012) (per curiam) (quoting *State v. Middleton*, 299 N.J. 22, 32

(App. Div. 1997) (quoting *State v. Green*, 89 N.J. 281, 292 (1981))). This case was not an

identification case. No eyewitness identified the petitioner as the perpetrator of the murder.

Accordingly, mistaken identity was not a theory supported by the evidence at trial. The state's

denial of this claim was not an unreasonable application of clearly established federal law.

Therefore, petitioner is not entitled to federal habeas relief on Claim III.

D. Claim IV – Manslaughter Lesser Included Offense Jury Instructions

In Claim IV, petitioner asserts that the trial court violated his due process rights by failing

to instruct the jury on the lesser included offenses of aggravated manslaughter and reckless

manslaughter. Petitioner raised this claim on direct review and the Appellate Division denied the

claim without comment.

In *Beck v. Alabama*, 447 U.S. 625, 638 (1980), the United States Supreme Court

determined that defendants in a capital case possess a constitutional right to have the jury

instructed on a lesser included offense. *See also Kontakis*, 19 F.3d at 119 ("In *Beck*, the

Supreme Court held that in a capital case the trial court committed constitutional error when it

would not charge on a lesser-included offense for which the evidence supported a conviction.").

In a footnote, the Supreme Court expressly reserved judgment on "whether the Due Process

Clause would require the giving of such instructions in a non-capital case." *Beck*, 447 U.S. at

638 n.7.

As this is not a capital case, petitioner fails to show the denial of this claim was an

unreasonable application of clearly established federal law as the Supreme Court has not

recognized that he has a due process right to jury instructions on lesser included offenses. *See*

*Wanger v. Hayman*, No. 09-6307, 2011 WL 32496, at *4 (D.N.J. Jan. 3, 2011) (collecting cases and finding that habeas relief could not be granted where petitioner failed to assert a due process violation recognized by the Supreme Court); *Urcinoli v. Cathel*, No. 05-4776, 2010 WL 5253524, at *17 (D.N.J. Dec. 17, 2010) ("[B]ecause Petitioner did not face the death penalty, Supreme Court precedent did not require the instruction on the lesser included offenses of manslaughter."); *Peoples v. Cathel*, No. 05-5916, 2006 WL 3419787, at *6-8 (D.N.J. Nov. 21, 2006). Accordingly, Claim IV will be denied.[2]

E. Claim V – Excluding Petitioner from Trial

In Claim V, petitioner alleges that his right to be present at every stage of the trial was violated. (*See* Pet. at p. 15.) He further claims that the trial court permitted trial counsel to enter into a stipulation on a prior conviction without his consent. (*See id.*)

At the trial, the jury was instructed on all counts save a firearm count: possession of a weapon by one not lawfully permitted to possess a weapon. The jury then deliberated on all but the firearm count. During the reading of this first set of verdicts, petitioner became disruptive and hostile:

> THE CLERK: As to count ten, possession of a weapon for an unlawful purpose, as to the charge that on January 27, 1998, in the City of Paterson, the defendant, Clarence E. Scott, did possess a certain weapon; namely, a handgun, with a purpose of using it unlawfully against Salvatore Giuliana and/or Frank Ferrigno, how do you find the defendant?
> THE FOREPERSON: We found the defendant guilty.
> THE DEFENDANT: Fuck that, man! He put the weapon up in the fucking coat, man. What's wrong with you people?

---

[2] Before the enactment of AEDPA, the Third Circuit applied *Beck*'s holding in capital cases to non-capital cases as well. *See Vujosevic v. Rafferty*, 844 F.2d 1023, 1027 (3d Cir. 1988). However, as previously stated, in analyzing this Claim under AEDPA, the Court must determine clearly established federal law as determined by the Supreme Court. *Lockyer*, 538 U.S. at 71 (2003). As illustrated above and in the post-AEDPA context, courts in this Circuit have found that *Beck* does not provide clearly established federal law in the non-capital context with reference to giving lesser included offense instructions.

THE COURT:  Sit down.
THE DEFENDANT:  Fuck you, man!  They put the fucking weapon on me, man.  They put the fucking weapon on me, man!
THE COURT:  Remove Mr. Scott from the courtroom.  Ladies and gentlemen, just step into the jury room.
THE DEFENDANT:  They fucking put the weapon on me, man.  The stupid ass motherfuckers, man.  Get the fuck off me!
(The jury returned to the jury room at 2:38 pm.)
THE COURT:  All right.  The record will reflect that after the defendant cursed repeatedly in a very loud and angry voice, there was a struggle with the defendant and several court officers, clearly brought on by the defendant entirely, he had to be physically taken from the courtroom.  [¶] Some of the people in the back of the courtroom became upset and began saying things in a loud voice.  The jury was removed but did see part of that.  [¶] Okay.  Mr. Scott can be taken.  He's not coming back into the courtroom.  I can hear him outside continuing to curse repeatedly and it probably has a decent chance of being heard in the jury room.  So, there's no way he can come back into the courtroom.

(Dkt. No. 24-23 at p. 23-24.)

Petitioner remained outside the courtroom while the trial judge instructed the jury on the weapons charge.  The jury was out for a very short period of time once they began deliberations on this final count.[3]  Before bringing back the jury to record the verdict on that charge, the trial judge noted as follows:

The jury has knocked and indicated that they have a verdict which is coming back very quickly.  I can't even consider bringing Mr. Scott into the courtroom because of what happened here and how soon it is after that.

He's not on the floor now but there was quite a physical confrontation between he and the sheriff's officers that, from everything I saw, was caused entirely by Mr. Scott.  And the cursing continued at a very high volume after he was brought into the security room and you could hear him.  His tone was very frightening and violent and there's no way I could bring him back into the courtroom.

---

[3] According to the trial transcript, the jury was out approximately three minutes after they were excused to deliberate on the weapons charge.  (*See* Dkt. No. 24-23 at p. 39-40.)  The time gap between petitioner's outburst and the reading of the verdict on the final weapons charge was approximately thirty minutes.  (*See id.* at p. 23, 40.)

I'm satisfied that he unquestionably waived his right to be present
by his conduct. And frankly, it seems to be he was going to do that
at some point. What he said here in the courtroom is what is
alleged to have been said by him to the police when they arrested
him. That same kind of description that I got at the *Miranda*
hearing is what I saw here in the courtroom. And today he had
some of his friends here in the courtroom and this was his first
opportunity perhaps for him to put this demonstration on for them.
So I can't even consider bringing him back into the courtroom.

(Dkt. No. 24-23 at p. 39-40.)

Petitioner raised his challenge to the trial judge's decision to exclude him from the

verdict reading on direct review. He further argued, as he does here, that the trial judge erred by

allowing trial counsel to stipulate, with petitioner's consent, that petitioner had a prior

conviction. The Appellate Division denied this claim without comment. For federal habeas

purposes, however, "Section 2244(d) [review] applies even where there has been a summary

denial" in state court. *See Pinholster*, 131 S. Ct. at 1402.

A defendant has a right to be present at all trial-related proceedings "'whenever his

presence has a relation, reasonably substantial, to the fullness of his opportunity to defend

against the charge. . . . [T]he presence of a defendant is a condition of due process to the extent

that a fair and just hearing would be thwarted by his absence, and to that extent only.'" *United

States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-

06 (1934) (citing *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975))); *see also Rushen v.

Spain*, 464 U.S. 114, 117 (1983) ("[T]he right to personal presence at all critical stages of the

trial . . . [is a] fundamental right[ ] of each criminal defendant.") (footnote omitted); *Illinois v.

Allen*, 397 U.S. 337, 338 (1970) ("One of the most basic rights guaranteed by the Confrontation

Clause is the accused's right to be present in the courtroom at every stage of his trial.") (citation

omitted). However, where a defendant's actions during trial are unduly disruptive, the trial judge

has the power to remove the defendant from the courtroom and continue the trial.  *See id.* at 343

("[A] defendant can lose his right to be present at trial.").

In *Allen*, the defendant was warned prior to being removed from trial proceedings.  *See*

*id.* at 340-41.  In deciding whether the defendant's constitutional rights were violated by this

removal, the United States Supreme Court explicitly held:

> that a defendant can lose his right to be present at trial if, after he
> has been warned by the judge that he will be removed if he
> continues his disruptive behavior, he nevertheless insists on
> conducting himself in a manner so disorderly, disruptive, and
> disrespectful of the court that his trial cannot be carried on with
> him in the courtroom.  Once lost, the right to be present can, of
> course, be reclaimed as soon as the defendant is willing to conduct
> himself consistently with the decorum and respect inherent in the
> concept of courts and judicial proceedings.

*Id.* at 343.  The Supreme Court further explained that there were at least three possible ways to

deal with such a disruptive defendant:  (1) keep him present and bound and gag him if necessary;

(2) cite him for contempt; or (3) remove him from the courtroom until such time as he evinces a

willingness to conduct himself properly.  *See id.* at 344-46.  Nevertheless, the Supreme Court

explained that, "[w]e believe trial judges confronted with disruptive, contumacious, stubbornly

defiant defendants must be given sufficient discretion to meet the circumstances of each case.

No one formula for maintaining the appropriate courtroom atmosphere will be best in all

situations."  *Id.*

Petitioner's behavior, as indicated by the trial transcript, was quite disruptive to court

proceedings.  Furthermore, after being told to "sit down" by the judge, petitioner continued his

disruptive rant.  Petitioner admits that a tussle ensued between him and the sheriff's officers.

(*See* Traverse at p. 8.)

The Supreme Court in *Allen* stated that trial judges should be given discretion to meet the circumstances of each case where there is a disruptive defendant. *See* 397 U.S. at 343. In this case, in light of petitioner's abrupt disruptive actions, the trial judge had no practical opportunity to warn petitioner before he was forcibly removed from the court proceedings. The fact that petitioner was not warned prior to being removed is not dispositive. *Accord Norde v. Keane*, 294 F.3d 401, 413 (2d Cir. 2002) ("Although it would have been preferable for the court to explain to Norde the potential ramifications of his removal, we cannot say that Norde's removal was improper. We have held that 'even absent a warning, a defendant may be found to have forfeited certain trial-related constitutional rights based on certain types of misconduct.") (quoting *Gilchrist v. O'Keefe*, 260 F.3d 87, 97 (2d Cir. 2001); *Lettley v. Walsh*, Civ. No. 01-5812, 2007 WL 450019, at *8 (E.D.N.Y. Dec. 20, 2007) (denying habeas claim where "the court had no practical opportunity to warn petitioner that his conduct would result in removal as petitioner did not misbehave during trial"), *report and recommendation adopted by*, 2008 WL 3925318 (E.D.N.Y. Aug. 26, 2008). The fact that the trial judge did not warn petitioner before removal does not warrant granting federal habeas relief as the state court's decision was not an unreasonable application of clearly established federal law. *See United States v. Goldberg*, 67 F.3d 1092, 1101 (3d Cir. 1995) (noting that in the context of whether a defendant will lose an attorney if he engages in dilatory tactics, "[w]hether or not a warning was required as a matter of constitutional law or under the particular facts is somewhat unclear."); *but see Gray v. Moore*, 520 F.3d 616, 624 (6th Cir. 2008) ("Although several of our sister circuits have held that trial courts may eschew the warning requirement when a defendant engages in extremely unruly behavior, we believe that the warning requirement from *Allen* cannot be interpreted in any non-

mandatory way, lest we substitute our own judgment of what the rule should be for that of the Court.").

In his traverse, petitioner also complains that he was not given an opportunity to return to court after his removal. The trial judge expressed his reasons for why he was not bringing back petitioner to hear the jury's verdict on the final weapons charge. The trial judge noted that he was concerned about petitioner's prior behavior and actions, which had occurred only a short time before the jury returned with its verdict. The Court does not find that the state court's denial of this claim was an unreasonable application of clearly established federal law given the unique circumstances of this case as described above. Indeed, the Supreme Court stated in *Allen* that trial judges should be given "sufficient discretion to meet the circumstances of each case." 397 U.S. at 343. The trial judge used that discretion in this case.

Petitioner also asserts that the trial court permitted trial counsel to enter into a stipulation of petitioner's prior conviction without petitioner's consent or knowledge. (*See* Pet. at p. 15.) Contrary to petitioner's assertions, that stipulation was noted on the record in open court. (*See* Dkt. No. 24-23 at p. 16.) Petitioner's argument is factually inaccurate.

Accordingly, for the foregoing reasons, Claim V does not merit granting federal habeas relief.

F. <u>Claim VI – Excluding Petitioner and Trial Counsel during Jury Request</u>

In Claim VI, petitioner argues that his constitutional right to be present at every stage of the trial was violated when the trial court dealt with jury requests outside the presence of petitioner. More specifically, petitioner contends that:

> The record reflects that the petitioner was not present during the trial court's communication and handling of the jury's note (exhibit C-5) to exchange the bullets for a gun and for a ruler, and

during another instance of the trial court's questioning of the jurors
concerning a readback of testimony to the jury (exhibit C-6).

(Pet. at p. 17.)  Petitioner raised this issue on direct appeal and the Appellate Division denied it

without comment.

Thirty-six minutes after the jury began its deliberations, the judge received a note from

the jury and the following was placed on the record:

> THE COURT:  I have a note from the jurors which we'll mark it
> whatever the next C number, which is 5.  It says, "Please exchange
> the bullets for the gun and let us have a ruler.  Thank you."
> So we'll mark this C-5 and include it in the court file.  And I'm
> going to send in a ruler.
> Now, the record should reflect that the attorneys are not here.  And
> this is a ruler – I have this in my desk.  It says, "In appreciation for
> your outstanding program, Rotary Club of Ringwood."  So maybe
> we won't send that in because someone will find something wrong
> with that.
> We have a plain ruler that our court clerk has.  It's a 15-inch ruler.
> We'll send that in.
> The record will reflect the attorneys are not here but I'm going to
> do this just so I can get it into the jury and then I'll mention it to
> the attorneys when they next come.
> Officer Muccio, you are going to bring in the ruler and exchange
> the bullets for the gun.

(Dkt. No. 24-22 at p. 82-83.)  Subsequently, when the attorneys were next present before the

judge and the jury was called back into court, the judge explained jury note C-5 to the parties.

He further explained that he had sent in a ruler and exchanged the bullets for the gun per the

jury's request.  (*See id.* at p. 86.)

"The Due Process Clause of the Fifth and Fourteenth Amendments guarantee a criminal

defendant the right 'to be present in his own person whenever his presence has a relation,

reasonably substantial, to the fullness of his opportunity to defendant against the charge.'"  *Ross*

*v. Dist. Attorney of the Cnty. of Allegheny*, 672 F.3d 198, 212 (3d Cir. 2012) (quoting *Kentucky*

*v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder*, 291 U.S. at 105-06))).  Nevertheless, this

does not mean "that the defendant has a 'constitutional right to be present at every interaction between a judge and a juror." *Id.* (internal quotation marks and citations omitted). Instead, "the defendant's right to be present extends to 'any stage of the criminal proceeding that is critical to its outcome if [the defendant's presence would contribute to the fairness of the procedure.'" *Id.* (quoting *Stincer*, 482 U.S. at 754). Thus, "[t]here is no constitutional right to be present 'when presence would be useless, or the benefit but a shadow.'" *Id.* (quoting *Snyder*, 291 U.S. at 106-07, *overruled on other grounds*, *Malloy v. Hogan*, 378 U.S. 1 (1964)).

The trial judge read jury note C-5 and performed the ministerial task of ordering an officer to replace the bullets with the gun. (*See* Dkt. No. 24-22 at p. 81.) Petitioner's presence during this proceeding "would be useless," and the benefit to petitioner's presence during this ministerial task would have been "but a shadow." Accordingly federal habeas is not warranted as the state court's denial of this issue was not an unreasonable application of clearly established federal law.

Within Claim VI, petitioner also argues that he was not present during the trial court's questioning of the jurors concerning the readback of testimony. Contrary to petitioner's assertion, he was present during the readback. (*See* Dkt. No. 24-22 at p. 85 ("THE COURT: We need the defendant before we can bring out the alternate.").) Accordingly, for the foregoing reasons, petitioner fails to show that he is entitled to federal habeas relief on Claim VI.

G. Claim VII – Ineffective Assistance of Counsel (Severance)

In Claim VII, petitioner contends that trial counsel was ineffective for failing to move to sever the murder charges from the separate offenses related to the attempted murder of the arresting officers. (*See* Pet. at p. 18-19.) He claims that, "[t]he State's theory that the murder weapon alleged to have been seized from the petitioner during his arrest could have still been

proffered without the need of the other-crimes evidence relating to the attempted murder charges." (*Id.* at p. 19.) Petitioner raised this claim on direct review and the Appellate Division denied the Claim without comment.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating an ineffective assistance of counsel claim. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013). Petitioner must identify acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. The federal court must then determine whether in light of all of the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. *See id.*

Second, a petitioner must affirmatively show prejudice, which is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

Additionally, in assessing an ineffective assistance of counsel claim under AEDPA, the Supreme Court has noted that:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington,* 131 S. Ct. at 785 (internal quotation marks and citation omitted) (emphasis in original).

The court finds that the denial of this claim was not an unreasonable application of the *Strickland* standard. As noted by respondent, the accompanying circumstances giving rise to the attempted murder charges of the police officers arose during petitioner's arrest which followed shortly after the murder of Wimbush. Under New Jersey law, "except as provided by [N.J.Crim.] R. 3:15-2(b), a defendant shall not be subject to separate trials for multiple criminal offenses based on the same conduct or arising from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction and venue of a single count." N.J. CRIM. R. 3:15-1(b). Thus, petitioner has not shown that severance would have even been granted if it had been requested.

Additionally, petitioner was found not guilty on various charges, including felony-murder of Wimbush, robbery of Wimbush, and attempted murder of Ferrigno. Petitioner's acquittal on these charges indicates that the jury was able to compartmentalize the evidence. *See United States v. Jimenez*, 513 F.3d 62, 83 (3d Cir. 2008) ("The jury's verdict reflects that the jury was able to compartmentalize the evidence as to each defendant and each count as evidenced by the

jury's acquittal on some counts and convictions on others."); *Park v. California*, 202 F.3d 1146, 1150 (9th Cir. 2000) ("[T]he failure of the jury's ability to convict on all counts is the best evidence of a jury's ability to compartmentalize the evidence.") (internal quotation marks and citations omitted); *United States v. Noske*, 117 F.3d 1053, 1057 (8th Cir. 1997) ("Acquittals of some defendants on some charges and a defendant charged only with count II show the jury was able to compartmentalize the evidence."). Accordingly, petitioner has failed to show that the denial of this Claim was an unreasonable application of *Strickland*'s prejudice prong. *Accord Lowell v. Yates*, Civ. No. 07-2450, 2010 WL 3608086, at *8 (E.D. Cal. Sept. 10, 2010) (finding that petitioner failed to show prejudice to establish ineffective assistance of counsel claim where he was acquitted on some charges which constituted strong evidence that the jury was able to compartmentalize the evidence). Therefore, Claim VII will be denied.

### H. Claim VIII – Right to Public Trial

In Claim VIII, petitioner claims that he was deprived of his right to a public trial because several of his friends were not permitted to view the trial. More specifically, he asserts:

> Sergeant Joseph Brady was the sole witness during a grand jury proceeding against petitioner for an attempted escape while being held over for the matter that is the subject of this federal petition. Brady was also present and acting as an officer of the court charged with handling court decorum and jury security for the matter that is the subject of this federal petition. During petitioner's trial, Brady interviewed people entering the courtroom as spectators, and when they explained they were there as either friends or family of the petitioner, they were refused admission. Brady never informed the trial judge about his exclusion of petitioner's family members and friends, and no hearing was held before such measures were implemented.

> At the time that Brady took it upon himself to exclude petitioner's family and friends, there was nothing in the record to suggest a likelihood that the families or other spectators were likely to be disruptive. And alternative to closure were not considered.

The closure lasted from jury selection until the State concluded with the presentation of its opening statement and witnesses.

Three witnesses provided statements or accounts that they were excluded from petitioner's trial. In a certification, Tameka Jones stated that she was denied entrance to petitioner's trial on two separate occasions and that other persons trying to enter were denied entry; Gregory Hickmon also reported having been denied entrance to trial; Samuel Sparks reportedly had the same experience.

(Pet. at p. 20-21.)

The last reasoned state court decision on this Claim was from the Appellate Division during petitioner's post-conviction relief proceedings. In denying relief on this Claim, the Appellate Division stated as follows:

Next, defendant, citing to *State v. Cuccio*, 350 N.J. Super. 248 (App. Div.), *certif. denied*, 174 N.J. 43 (2002), provides a brief argument that his constitutional right to a public trial was violated because one of his friends was allegedly barred from entering the courtroom during his trial. We disagree. Moreover, this argument is barred by *Rule* 3:22-4.

Both the United States and New Jersey Constitutions provide the accused with the "right to a speedy and public trial." U.S. Const. amend VI; N.J. Const. Art. I, § 10. This right extends to all pretrial proceedings. *State v. Venable*, 411 N.J. Super. 458, 463 (App. Div. 2010) (citations omitted). "If a defendant's right to a public trial has been denied, the error is considered to be 'structural' and therefore requires a reversal of a conviction without a showing that the defendant was prejudiced by the denial." *Ibid.* (citation omitted).

This right, however, is not absolute. *Cuccio*, *supra*, 350 N.J. Super. at 260. In a recent decision by this court, *State v. Venable*, *supra*, 411 N.J. Super. 458, the trial court asked members of the defendants' family and the victim's family to leave the courtroom during jury selection for security reasons because there were going to be nearly one hundred potential jurors and the courtroom would be too crowded. *Id.* at 462. We found no constitutional deprivation, adopting a "triviality standard" used by other jurisdictions, which looks at "whether the actions of the court and the effect they had on the conduct of the trial deprived the

defendant – whether otherwise innocent or guilty – of the protections conferred by the Sixth Amendment." *Id.* at 464 (citation omitted).

The *Venable* court distinguished the facts from *Cuccio*, *supra*, 350 N.J. Super. 248, where the courtroom was completely closed to all spectators, and noted that "this case did not involve a situation, such as in *Cuccio*, where a member of the defendant's family was qualified and prepared to assist in his defense if allowed to remain in the courtroom." *Venable*, *supra*, 411 N.J. Super. at 466-67. Though the court refrained from expressing an opinion on whether the failure to object to the exclusion of family members constitutes a waiver, the court did note the lack of objection. *Id.* at 467, n.3.

Here, defendant alleges a violation of his constitutional rights to a public trial and attaches a signed certification from his friend, Tameka Jones. In the March 26, 2008 certification, Jones alleges that she attempted "on at least two occasions" to attend defendant's trial and was "informed by a sheriff's officer that the courtroom was closed to the public and [she] was not allowed to enter." According to Jones, "[o]ther persons also trying to enter the courtroom were given the same information and denied entry." Jones did not provide the names of the officer, nor the other individuals allegedly denied entry.

Judge Marmo found that defendant's right to a public trial was not violated. He noted that there was never an order barring the public from the courtroom, that the courtroom was never closed, and "[t]his trial in fact was heavily attended by people who are associated with the victim . . . . there were quite a number of people here every day . . . many of them people who are associated with the defendant." Judge Marmo also explained how defendant engaged in an outburst when the verdict was read and had to be wrestled to the floor and escorted out of the courtroom. There were also a large number of security guards in the courtroom because of "concern that there was some gang involvement here" and defendant and young men in the courtroom were making hand gestures back and forth. Finally, he pointed to a number of portions of the trial transcripts which indicate that members of defendant's family, the victims' family, members of the press, and members of the public were present. Applying the *Venable* "triviality standard," we find that defendant has not proven that Jones' alleged exclusion was anything but "trivial."

(Dkt. No. 24-38 at p. 11-14.)

The Sixth Amendment guarantees that the accused has the right to a public trial. *See* U.S. CONST. amend VI. "This right, however, is not absolute. An unjustified courtroom closure only infringes a defendant's Sixth Amendment rights if it undermines the values of the Supreme Court identified in *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L.Ed.2d 31 (1984) as fundamental to the public trial guarantee." *United States v. Sutton*, 502 F. App'x 139, 141 (3d Cir. 2012). In determining whether a courtroom closure violates a defendant's Sixth Amendment rights, a court examines whether it undermines the values of the public trial right "which include: (1) ensuring a fair trial; (2) reminding the government and the judge 'of their responsibility to the accused and the importance of their functions'; (3) encouraging witnesses to come forward; and (4) discouraging perjury." *United States v. Greene*, 431 F. App'x 191, 195 (3d Cir. 2011) (quoting *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996)); *see also Sutton*, 502 F. App'x at 141-42. If the closure does not subvert these values, "it did not offend the Sixth Amendment because the closure is considered trivial." *Id.* at 142. While a triviality determination is not determined by one factor, "a closure was trivial and did not implicate the values advanced by the public trial guarantee when the trial judge was unaware of the closure and it was limited in both scope and duration." *Id.* (citation omitted). Nonetheless, a key issue is "whether the trial judge either initiated or ratified the closure in order to pinpoint to whom such inadvertence is attributable." *See Greene*, 431 F. App'x at 196

As an initial matter, a factual finding was made that the trial court never ordered the public from the courtroom. Petitioner has not shown by clear and convincing evidence that this factual finding was in error. *See* 28 U.S.C. § 2254(d)(2). The Court will analyze petitioner's claim with this fact in mind.

The Appellate Division's finding that petitioner failed to show that the exclusion was anything but trivial was not an unreasonable application of clearly established federal law. Any purported exclusion was limited in duration and scope. Furthermore, and perhaps more importantly, any purported closure was not made known to the trial judge as petitioner never objected and was therefore complicit in allowing the court's unawareness of the closure to persist. Finally, the alleged closure was not ratified or affirmed by any subsequent act by the trial judge. Under these circumstances, the state court's decision was not an unreasonable application of clearly established federal law. *Accord Greene*, 431 Fed. Appx. at 196-97 (finding no constitutional violation where closure was limited in duration and scope, closure was unknown to the trial judge as defendant did not object and closure was not subsequently ratified by an act of the court). Claim VIII will be denied.

I. Claim IX – Confrontation Clause

In Claim IX, petitioner argues that the admission of hearsay statements from a non-testifying witness violated his Sixth Amendment right to confrontation. More specifically, he states as follows:

> There were numerous instances of hearsay evidence and/or statements of a non-testifying witness named James "Jayvon" Taborn, introduced at the petitioner's trial. The hearsay statements of Jayvon, a non-testifying witness were introduced throughout the prosecutor's opening arguments at the petitioner's trial. The hearsay testimony was as follows:
>
> > Mr. Belton . . . had been hanging out with several friends, one of whom is named Jayvon. Jayvon's real name is Jerome Taborn. As Mr. Belton was walking back from Matlock Street . . . Tabron was walking over to Building 1. Within a couple of seconds, Jayvon came running back to Mr. Belton. Apparently there was something happening over at Building 1.

> Now, what was happening over at Building 1 was a
> man named Joseph Robinson and a man named
> Alphonso Lee were being robbed in the entrance
> way of Building 1.  This is apparently what was
> seen by Jayvon.

During examination of a witness, the following exchange occurred:

> Q.  Was Jayvon in the area then?
> A.  Yes.
> Q.  And that was when what happened with Jayvon?
> A.  He came out of the building told us he'll see us
> tomorrow.  Which he walked down to Building 1
> and he ran back to Building 2 stating that a guy had
> two guys down on the floor in the building . . . .
> Q.  Did Jayvon say anything?
> A.  Yeah, he did yell that that was the guy with the
> gun in the building.

> The prosecutor also put before the jury hearsay testimony of
> Alphonso Lee, which involved details of other-crimes evidence, in
> that petitioner was not charged for robbery of Alphonso Lee who
> was allegedly with Joseph Robinson, the party petitioner was
> charged with robbing.  Throughout the trial, the jury heard, from
> the prosecutor's mouth himself, as well as other state's witnesses,
> that petitioner robbed Lee as well.

(Pet. at p. 23-24.)

The admissibility of evidence is generally a question of state law which is not cognizable

under federal habeas review.  *See Wilson v. Vaughn*, 533 F.3d 208, 213 (3d Cir. 2008) (citing

*Estelle*, 502 U.S. at 72).  Nevertheless, if the erroneous admission of testimonial hearsay raises a

concern of constitutional magnitude under the Confrontation Clause, the error is reviewed to

determine whether it is harmless.  *See, e.g.*, *Fry*, 551 U.S. at 121.  Under that harmless error

standard, a court assesses the prejudicial impact of the constitutional error to determine whether

it had a substantial and injurious effect on the jury's verdict.  *See id.* (citing *Brecht*, 507 U.S.

619); *see also Bond*, 539 F.3d at 275-76 (3d Cir. 2008) (applying *Brecht* harmless error analysis

to Confrontation Clause claim).

The prosecutor's statements cited above during his opening statements were not hearsay. "Hearsay is traditionally defined as an unsworn, out-of-court statement offered in court for the truth of the matter asserted." *United States v. DeCarlo*, 458 F.2d 358, 363 (3d Cir. 1972) (citation omitted). The prosecutor's opening statement is not evidence. *See Priester v. Vaughn*, 382 F.3d 394, 399 (3d Cir. 2004). Indeed, the trial judge instructed the jury that the evidence in the case consisted of the testimony they heard from the witness stand and the exhibits that had been admitted into evidence. (*See* Dkt. No. 24-21 at p. 25.) The jury is presumed to have followed the trial court's instructions as to what constituted evidence, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and the jury was not instructed that the prosecutor's opening statement constituted evidence.

Moreover, the quoted testimony petitioner cites as purported inadmissible hearsay is a colloquy between the prosecutor and witness Raysun Belton. Belton testified that Tabron told him that there was a "stickup" going on. (*See* Dkt. No. 24-8 at p. 6.) Assuming *arguendo* that the admission of Tabron's statements was inadmissible hearsay, the Court finds any purported error was harmless. Tabron's statement was not the only evidence that implicated petitioner. As described Part II, *supra*, Robinson was an eyewitness to the "stick up" as he was the individual purportedly being robbed. Thus, the admission of Tabron's statement by Belton did not have a substantial and injurious effect on the jury's verdict. The jury heard first-hand specific evidence and details from Robinson as to the incident giving rise to the robbery charge.

Additionally, petitioner argues that the trial court improperly admitted testimony that petitioner robbed Alphonso Lee, even though petitioner was not charged with robbing Alphonso Lee. (*See* Pet. at p. 24; Traverse at p. 20.) First, to the extent that petitioner argues that the prosecutor's opening statement constituted hearsay, the Court has already found that the

prosecutor's opening statement is not evidence, and, therefore, there is no Confrontation Clause issue. Second, petitioner appears to argue that the trial court improperly introduced the hearsay of Alphonso Lee when Robinson testified. The Court has reviewed Robinson's testimony and finds that any purported hearsay that Lee was also being robbed was harmless. Notably, petitioner was not charged with robbing Lee, thus, he suffered no harm from the purported hearsay testimony. Furthermore, as indicated, the jury heard first-hand direct evidence from Robinson as to the circumstances giving rise to the robbery charge pertaining to him. Any hearsay statements from Lee that Robinson testified to did not have a substantial or injurious effect on the jury's verdict. Accordingly, Claim IX will be denied.

J. Claim X – Ineffective Assistance of Counsel

In Claim X, petitioner raises several ineffective assistance of counsel claims. The standard for an ineffective assistance of counsel claim was previously set forth in *supra* Part IV.G. In short, petitioner has to show that counsel's performance fell below an objective standard of reasonableness and that he suffered prejudice in that, but for counsel's ineffectiveness, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694, 699.

i. *Failure to Request Jury Charge on Lesser Included Offenses of Aggravated Manslaughter and Reckless Manslaughter*

First, petitioner argues that trial counsel should have requested a jury charge on the lesser included offenses of aggravated manslaughter and reckless manslaughter. The Appellate Division analyzed this issue in reviewing petitioner's post-conviction relief petition and stated the following:

> Defendant argues trial counsel should have requested a jury
> instruction on the lesser-included offenses of aggravated

manslaughter and reckless manslaughter.  On direct appeal,
defendant argued in his supplemental pro se brief:

> The failure of the trial court to instruct the jury on
> the lesser-included offense of aggravated
> manslaughter constituted a violation of defendant's
> right to due process of law and a fair trial [under]
> U.S. Const. Amends. V, VI, and XIV; N.J. Const.
> Art. I, Pars. 1, 9 and 10.

> Though this is now argued as an ineffective assistance of counsel
> claim, this court already decided that the argument that the jury
> should have been instructed on lesser-included charges "lack[ed]
> sufficient merit to warrant discussion in a written opinion
> [pursuant to Rule] 2:11-3(e)(2)."  *State v. Scott*, *supra*, No. A-
> 1732-03T4 slip. op. at 14-15.  Therefore, defendant has not
> established that "but for counsel's unprofessional errors, the result
> of the proceeding would have been different."  *Castagna*, *supra*,
> 187 N.J. at 315.

(Dkt. No. 24-38 at p. 7-8.)

The denial of relief on this issue was not an unreasonable application of clearly
established federal law.  Petitioner's defense theory at trial was an all-or-nothing defense with
respect to the charges.  Petitioner took the stand and testified that he was completely innocent of
the charges.  The denial of this claim was not an unreasonable application of the *Strickland*
standard as lesser included offenses would have been completely inconsistent with petitioner's
defense theory at trial. *Accord Lopez v. Thurmer*, 594 F.3d 584, 588 (7th Cir. 2010) (holding
that decision not to request lesser-included offense instruction "appears to have been strategic"
where instruction would have been inconsistent with defendant's testimony that he "was
innocent of any crime"); *Archy v. Phelps*, No. 11-905, 2013 WL 326920, at *6 (D. Del. Jan. 28,
2013) (noting that counsel requesting lesser included offense instruction would have been
inconsistent with defense theory at trial that petitioner was not the shooter);  *Pratt v. Upstate
Corr. Facility*, 413 F. Supp. 2d 228, 245 (W.D.N.Y. 2006) (finding that counsel's failure to

request lesser included offenses instruction did not rise to level of ineffective assistance where counsel's strategy at trial was to pursue a misidentification defense and deny all guilt). This argument does not merit granting federal habeas relief.

ii.  *Failure to Request Jury Charge on Lesser Included Offense of Attempted Theft*

Petitioner also argues that trial counsel was ineffective for failing to request a jury charge of attempted theft of Robinson. More specifically, petitioner asserts that:

> The only witness who observed any of the alleged criminal conduct testified that the alleged robber never said anything, in fact, that it was thought to be some kind of joke at first. That it was Alphonso Lee that escalated and controlled the situation. Robinson further testified, that on his own he handed the alleged robber his money, but that before leaving, the person had given him (Robinson) the money back.

(Pet. at p. 25-26.)

It does not appear that petitioner ever raised this issue in state court. Nevertheless, respondent requests that the issue be decided on the merits. The Court will apply *de novo* review on this issue as it has not been adjudicated on the merits in state court. *See Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009); *see also Lucero v. Martinez*, No. 12-3844, 2013 WL 1736807, at *2 n.5 (3d Cir. Apr. 23, 2013) (citing *Evans v. Court of Common Pleas, Delaware Cnty*, 959 F.2d 1227, 1231 (3d Cir. 1992) ("[A] district court may deny a claim on its merits despite non-exhaustion if it is perfectly clear that the applicant does not raise even a colorable federal claim.") (internal citations and quotation marks omitted)).

Petitioner fails to show that counsel's performance fell below an objective standard of reasonableness. Petitioner's defense at trial was that he engaged in none of the conduct for which he was charged. Accordingly, as described above, it would have been inconsistent for trial counsel to request a jury charge on the lesser included offense of attempted theft in light of

the defense's all-or-nothing approach. The petitioner has failed to overcome the presumption

that under these circumstances, the challenged action (or inaction) by his trial counsel was sound

trial strategy. *See Strickland*, 466 U.S. at 689 (setting forth presumption); *Lopez*, 594 F.3d at 588

(holding that decision not to request lesser-included offense instruction "appears to have been

strategic" where instruction would have been inconsistent with defendant's testimony that he

"was innocent of any crime"). Therefore, federal habeas relief is not warranted on this claim.

iii.    *Failing to File a Motion to Dismiss the Indictment*

Petitioner also contends that trial counsel was ineffective for failing to file a motion to

dismiss the indictment. Specifically, petitioner argues that:

> During the Grand Jury, the prosecuting attorney presented a
> statement to the grand jury of Omar Green, who had given the
> police a bogus address, of which the State had to be aware of and
> the grand jury was under the impression that this testimony was
> from a reliable witness and it played a key part in their returning of
> the indictment.

(Pet. at p. 26.) Petitioner raised this claim in his post-conviction relief petition. The Appellate

Division analyzed this issue as follows:

> Defendant next argues that trial counsel was ineffective for failing
> to file a motion challenging the indictment. During grand jury
> proceedings, Omar Green's statement to the police was read to the
> grand jury. In the statement, Green details the shooting and
> provides characteristics about the gunman that match defendant's
> description. Defendant contends that "[t]his Omar Green was
> actually determined to be [a] fictitious or deceased individual at the
> time his statement was supposedly taken" and thus counsel should
> have challenged the indictment because the grand jury was no
> longer "unbiased."
>
> Defendant's argument is without merit. Defendant has provided
> no evidence to support his contention that Green was a fictitious or

> deceased person. Further, Judge Marmo's finding that "Green's
> testimony is not something that would have made a difference
> resulting in [defendant] not being charge with these offenses" is
> supported by the record. The grand jury heard the testimony of
> four police officers and were read statements by four witnesses, all
> providing descriptions of the gunman that implicated defendant.
> The State also presented testimony that defendant was arrested in
> possession of a gun that had the same type of bullets in its
> chambers that was used in the shooting. Thus, even if defendant
> could establish that Green was a fictitious person, defendant has
> not proven that the result of his proceeding would have been any
> different if his counsel had moved to challenge the indictment.
> *Castagna, supra,* 187 N.J. at 315.

(Dkt. No. 24-38 at p. 8-9.)

The Appellate Division recited the facts that supported the indictment beyond Green's

testimony and determined that the testimony provided the necessary support to indict petitioner.

Petitioner has not shown by clear and convincing evidence that the Appellate Division was

incorrect in reciting the facts underlying the indictment. Furthermore, the Appellate Division

determined that based on these additional supporting facts, even if trial counsel had moved to

dismiss the indictment, the result would not have been any different. This was not an

unreasonable application of *Strickland* which requires the petitioner to show to a reasonable

probability that the outcome of the proceeding would have been different. Accordingly,

petitioner is not entitled to federal habeas relief on this argument.

    iv. *Failure to Investigate and Prepare Case*

Next, petitioner argues that trial counsel failed to investigate and prepare the case.

Petitioner asserts in his petition that "[t]here is no proof that counsel interviewed any of the

police officers or other witnesses." (Pet. at p. 26.) In his traverse, petitioner claims that his trial

counsel did not know "a statement of an unidentified man – only to be found as a deceased

person and assisted in indicting petitioner," and that "interviewing witnesses in court hallway during trial was not effective." (Traverse at p. 11.)

Petitioner raised this issue in his post-conviction relief proceedings. The last reasoned decision on this issue was from the Appellate Division, which stated as follows:

> Defendant also argues that his trial counsel failed to fully investigate and prepare for his case . . . All of these arguments are without sufficient merit to warrant a written opinion. R. 2:11-3(e)(2).
>
> Furthermore, a petitioner "must do more than make bald assertions that he was denied the effective assistance of counsel." *State v. Cummings*, 321 N.J. Super. 154, 170 (App. Div.), *certify. denied*, 162 N.J. 199 (1999). Where a petitioner alleges counsel failed to investigate the case or call witnesses, the petitioner "must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon [the individual's] personal knowledge." *Ibid*. Here, defendant has provided no evidence to establish what further investigation would have been found and what their testimony might have been. Ultimately, he has not demonstrated how the outcome of the proceeding would have been different if counsel had investigated further. *Castagna*, *supra*, 187 N.J. at 315.

(Dkt. No. 24-38 at p. 9-10.)

The state court decision was not an unreasonable application of the *Strickland* standard. Petitioner does not show what any potential further investigation would have produced so as to change the outcome of the proceeding, to a reasonable probability. *Accord Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (stating that a showing of *Strickland* prejudice cannot be based on mere speculation about what the witnesses counsel failed to locate may have said but that it must be based on the potential witness's testimony to the habeas court); *United States v. Thomas*, 221 F.3d 430, 437-38 (3d Cir. 2000) (ineffective assistance of counsel claim based on failure to call witnesses was too vague to warrant review when witnesses were not identified).

To the extent that petitioner argues that further investigation would have led counsel to find out that Omar Green, whose police statement was read to the grand jury, was deceased, petitioner fails to show that the denial was an unreasonable application of *Strickland*. Indeed, as previously described, the state court determined that there was sufficient evidence besides Green's testimony to support the indictment. Therefore, this argument also does not warrant granting federal habeas relief.

      v.     *Failing to Request Curative Instruction on Prejudicial Testimony*

Petitioner also argues that trial counsel was ineffective when he failed to request a curative instruction after the introduction of testimony the trial judge had declared was too prejudicial. In the petition, petitioner specifically alleges that:

> During direct examination of State's witness Joseph Robinson, he testified that during the alleged robbery, he could not identify the gunman. However, the prosecutor attempted to elicit testimony that Mr. Robinson not only knew but could also recognize the petitioner's voice from previous conversations. The prosecutor attempted to give the impermissible inference that Mr. Robinson made a voice identification.

> During the improper line of questioning of Mr. Robinson, the prosecutor also elicited testimony that Mr. Robinson remembers petitioner from an incident, where his sister had screamed from out a window for Mr. Robinson who was outside to come into the apartment building right away. Also, that Mr. Robinson's sister was scared of someone who was hiding in the apartment building hallway, who turned out to be petitioner. Defense counsel immediately objected, asserting, that there was nothing turned over to the defense about this alleged prior incident, and that the line of questioning was improper.

> The jury was sent out of the courtroom, and a hearing was held concerning the testimony of Mr. Robinson. The trial judge concluded, that the testimony the prosecutor was eliciting about petitioner hiding from someone and Robinson's sister being scared, was too prejudicial to allow introduction thereof.

> The problem is that, the testimony about petitioner hiding, and his sister being scared was already elicited. However, there was no curative instruction given to the jury on how to deal with the testimony they heard.

(Pet. at p. 26-27.)

Petitioner claims that he raised this issue in his post-conviction relief proceedings. However, a review of petitioner's post-conviction relief brief to the Appellate Division indicates that he did not raise this issue. (*See* Dkt. No. 24-35.) Nevertheless, the Court can and will deny the claim on the merits applying *de novo* review. *See Simmons*, 590 F.3d at 231 (stating where state court decision is not on merits, court applies *de novo* review).

Petitioner fails to show that counsel's performance fell below an objective standard of reasonableness. Petitioner claims that the jury heard testimony that Robinson's sister was scared of someone who was hiding in the apartment building hallway. Petitioner mischaracterizes the record. Robinson testified that his sister had asked him to come upstairs as she did not have her key to get into the house. (*See* Dkt. No. 24-6 at p. 76.) He then testified that when he went upstairs, "[s]he was scared, kind of scared." (*Id.*) Subsequently, the prosecutor asked Robinson whether, "at some point, did you see Shabazz."[4] (*Id.* at p. 77.) Robinson then testified that he did not see Shabazz at first, but that he "ran into his sister and she said something about some guy was --" (*Id.*) At that point, petitioner's counsel requested a sidebar conference and the jury was excused. (*See id.*)

During a conference outside the presence of the jury, the attorneys and the trial judge engaged in a discussion about Robinson's testimony. Petitioner's trial counsel indicated that the incident between Robinson and his sister was not within the discovery of the case. Ultimately, the trial court determined that questioning Robinson about this incident would be too prejudicial

---

[4] Shabazz was a nickname of petitioner.

to petitioner. Subsequently, the last question was read back so that petitioner's counsel could determine whether a curative instruction was needed. No curative instruction was requested.

Trial counsel was not ineffective by failing to request a curative instruction. Robinson's testimony on the incident involving his sister and petitioner was put on the record outside the presence of the jury so that the judge could determine whether it was admissible. The trial judge ultimately determined that it was not admissible. Counsel was not ineffective because no curative instruction was necessary. The testimony from Robinson that his sister was scared of petitioner was not admitted into evidence. The jury only heard that Robinson's sister was scared, not that she was scared of petitioner.

Furthermore, the Court finds that even if counsel should have requested a jury instruction, petitioner fails to show to a reasonable probability that the outcome of his trial would have been any different. This was not a weak case against petitioner as the facts outlined in Part II, *supra*, indicate. Even had counsel requested a curative instruction and it was granted, it would not have changed the outcome of trial to a reasonable probability. Accordingly, this argument does not warrant granting federal habeas relief.

vi. *Failing to Challenge State's Failure to have Victim of Attempted Murder Testify*

Petitioner next argues that trial counsel was ineffective for failing to challenge the prosecutor's failure to have Officer Giuliana testify at trial. Specifically, petitioner asserts in his petition that his:

> Constitutional Right to confrontation/cross-examination of his accuser were violated when Officer Sal Guilianna [sic], whom the petitioner were charged with attempted murder and aggravated assault against [sic] was not called to testify, instead his partner Officer Ferrigno testified, in which the petitioner was acquitted of the charges against him. Had Officer Guilianna [sic] testified and been subject to cross-examination, there is a strong possibility that petitioner will have been acquitted of any charges against him as

46

> well, had counsel brought this point to the attention of the jury,
> during trial and in his closing summation.

(Pet. at p. 27-28.)  The Appellate Division during petitioner's post-conviction relief proceedings

analyzed this issue as follows:

> Judge Marmo found that defendant did not demonstrate that
> Officer's Giuliana's testimony would have been helpful to
> defendant.  Defendant alleges his "constitutional right to confront
> and cross-examine this witness" was violated.  However, defendant
> has raised no specific arguments that trigger the Confrontation
> Clause.  *See State v. Coder*, 198 N.J. 451, 468-69 (2009)
> (confrontation clause bars "admission of testimonial statements of
> a witness who did not appear at trial unless he was unavailable to
> testify, and the defendant had a prior opportunity for cross-
> examination") (citation omitted).  Defendant merely alleges that
> Giuliana did not testify, not that his testimonial hearsay statements
> were in any way presented to the jury without defendant's ability
> to confront Giuliana directly.

(Dkt. No. 24-38 at p. 10-11.)  In denying relief, the Appellate Division further noted that

petitioner needed to show what the testimony of the witness would have been to show that the

outcome of the proceeding would have been different.  (*Id.* at p. 10.)

The denial of relief on this argument was not an unreasonable application of the

*Strickland* standard.  Petitioner fails to show that he was prejudiced by counsel's failure to call

(or have the prosecution call) Giuliana to the stand.  He does not show how his alleged testimony

would have changed the outcome of the proceedings to a reasonable probability.  Additionally,

for the reasons discussed in Part IV.K, *infra*, petitioner's Confrontation Clause rights were not

violated by the prosecutor's decision not to call Giuliana to testify.  This argument does not merit

federal habeas relief.

     vii.    *Failing to Object to Exclusion of Members of the Public from Trial*

Related to Claim VIII, petitioner asserts that trial counsel was ineffective for failing to

object to the fact that members of the public were purportedly excluded from his trial.  (*See* Pet.

at p. 28.)  In his traverse, petitioner states that he made his trial counsel aware that Sergeant Brady was purportedly denying petitioner's family and friends from entering the courtroom. (*See* Traverse at p. 14.)  It does not appear that petitioner raised this ineffective assistance of counsel claim in state court.  Therefore, the claim will be reviewed *de novo* as it was not adjudicated on the merits.

Raised as an ineffective assistance of counsel challenge, petitioner needs to show prejudice in order to prevail on this claim.  To make that prejudice showing, petitioner needs to show that had counsel raised the issue of Sergeant Brady's purported actions to the trial court, the outcome of the proceeding would have been different, at least to a reasonable probability.

Petitioner fails to show prejudice as he does not even attempt to show that had counsel raised this issue with the trial court, the result of trial would have been different.  Additionally, the Court notes that the state court's determination that any exclusion was trivial was not an unreasonable application of clearly established federal law.  Accordingly, this argument does not merit federal habeas relief.

viii.    *Failing to Provide Petitioner with Ballistic Reports or Discovery*

Petitioner also argues that trial counsel failed to provide him with ballistic reports or discovery.  Petitioner raised this issue in his post-conviction relief proceedings.  The Superior Court determined that petitioner failed to show that he was prejudiced as there was no allegation as to what would have been the result had petitioner had the discovery.  (*See* Dkt. No. 24-25 at p. 12.)  The Appellate Division denied relief stating that it was "without sufficient merit to warrant a written decision."  (Dkt. No. 24-38 at p. 9.)

The denial of this claim was not an unreasonable application of *Strickland*.  As noted by the Superior Court, petitioner failed to show how the outcome of his trial would have been

different had he been presented with ballistic and discovery materials. Accordingly, he did not show that he was prejudiced.

For the foregoing reasons, the arguments within Claim X do not merit federal habeas relief and it will be denied.

K. Claim XI – Confronting Attempted Murder Victim at Trial

In Claim XI, petitioner raises the substantive challenge that his Confrontation Clause rights were violated when Officer Giuliana did not testify at trial. "[T]he Confrontation Clause protects the defendant *only* against the introduction of testimonial hearsay statements[.]" *See United States v. Berrios*, 676 F.3d 118, 126 (3d Cir. 2012) (citations omitted) (emphasis in original). In this Claim, petitioner does not argue that his Confrontation Clause rights were violated because the trial court introduced hearsay statements of Giuliana. Instead, petitioner's argument appears to be merely that he was not given the opportunity to question Giuliana at trial. This does not raise a cognizable Confrontation Clause claim as it does not relate to an out-of-court statement of Giuliana admitted at trial. *See id.* (stating that Confrontation Clause only protects defendant against introduction of testimonial hearsay statements). Furthermore, as described *supra*, petitioner failed to show that he was prejudiced by trial counsel's failure to call Giuliana as a witness. Federal habeas relief is not warranted on this Claim and it will be denied.

L. Claim XII – Insufficiency of Robbery Evidence

In Claim XII, petitioner claims that there was insufficient evidence to support a robbery conviction. He argues that Robinson testified that the robber never requested or demanded money. Rather, Robinson gave the money to the gunman and the gunman subsequently gave the money back to Robinson. (*See* Traverse at p. 21.)

Petitioner raised this issue in his post-conviction relief proceedings. The Appellate Division determined that it was procedurally barred as petitioner failed to raise the issue on direct appeal. (*See* Dkt. No. 24-38 at p. 14.) While the state court decided that this Claim was procedurally barred, respondent asks to have the Court deny the claim on the merits. *See Szuchon v. Lehman*, 273 F.3d 299, 321 (3d Cir. 2001) ("A state ordinarily is required to assert a procedural default in its answer if it intends to rely on that defense.") As no state court adjudicated the merits of this Claim, the Court must apply *de novo* review to this Claim if it is to be assessed on the merits. *See Lucero*, 2013 WL 1736807, at *2 n.5 (citing *Evans*, 959 F.2d at 1231 ("[A] district court may deny a claim on its merits despite non-exhaustion if it is perfectly clear that the applicant does not raise even a colorable federal claim.") (internal citations and quotation marks omitted)).

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction, if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A petitioner raising an insufficiency of the evidence claim faces a "'very heavy burden' to overturn the jury's verdict for insufficiency of the evidence." *United States v. Root*, 585 F.3d 145, 157 (3d Cir. 2009) (citing *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)).

"When assessing such claims on a petition for habeas relief from a state conviction, the sufficiency of the evidence standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Robertson v. Klem*, 580 F.3d 159, 165

(3d Cir. 2009) (quoting *Jackson*, 443 U.S. at 324 n.16).  In New Jersey, robbery is defined as follows:

> A person is guilty of robbery if, in the course of a committing a theft, he:
>> (1) Inflicts bodily injury or uses force upon another; or
>> (2) Threatens another with or purposely puts him in fear of immediate bodily injury; or
>> (3) Commits or threatens immediately to commit any crime of the first or second degree.
>
> An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.

N.J. STAT. ANN. § 2C-15-1.

The Court finds that petitioner has failed to establish that he is entitled to federal habeas relief on this insufficiency of the evidence claim.  Through Robinson's testimony, the prosecution elicited evidence that upon Robinson and Lee exiting an elevator together, there was a man standing there with a gun.  (*See* Dkt. 24-6 at p. 36.)  Robinson testified that he thought a robbery was taking place so he handed the man with the gun his money.  (*See id.* at p. 38.)  Furthermore, Robinson testified that he was in fear and he thought he was in real danger.  (*See id.* at p. 40.)  Additionally, Robinson testified that at some point both he and Lee ended up on the floor.  (*See id.* at p. 41.)  Robinson further stated that he thought they ended up on the floor due to the presence of the gun.  (*See id.*).

Petitioner is correct that Robinson testified that the gunman gave the money back to him after the gunman recognized Robinson.  However, in light of Robinson's testimony regarding the incident before the gunman recognized Robinson, and particularly when this evidence is viewed in the light most favorable to the prosecution, the Court finds that a rational trier of fact could have found petitioner guilty of robbery.  As noted, the New Jersey statute defines robbery to

include threats or actions that put the victim "in fear of immediate bodily injury" in the course of committing or attempting to commit a theft. N.J. STAT. ANN. § 2C-15-1. Accordingly, this claim does not warrant granting federal habeas relief and it will be denied.

M. Claim XIII – Prosecutorial Misconduct

In Claim XIII, petitioner raises two claims of prosecutorial misconduct; specifically petitioner contends that:

> (a) During its summation, the state told the jury that its expert had testified that the shell that was found was consistent with the alleged murder weapon and the bullet recovered from the victim. The state's expert, however, never testified that the recovered bullet had been fired from the murder weapon. The state knowingly misrepresented the testimony of the state's expert to the jury and later on to the appellate division.
>
> (b) The State elicited double hearsay testimony from its witness Joseph Robinson that was extremely prejudicial to petitioner. . . . When the trial court asked the state after defense counsel's objection as to where the information came from, the prosecutor responded that "the victim's brother Ronnie Winbush (not a witness for the state) heard it from someone else on in the streets."

(Pet. at p. 32-33.) In petitioner's post-conviction relief proceedings, the Appellate Division determined that petitioner's prosecutorial misconduct arguments were procedurally barred as they could have been raised on direct appeal. (*See* Dkt. No. 24-38 at p. 14.) Nevertheless, respondent does not invoke the procedural default defense in the answer. As the Claim was not adjudicated on the merits in state court, *de novo* review applies.

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Waingright*, 477 U.S. 168, 182-83 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks and citation omitted). A prosecutorial misconduct claim is

examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht*, 507 U.S. at 638. A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

     i.   *Summation*

Petitioner contends that the prosecutor misrepresented the testimony of the state's expert during his summation. Petitioner contends that, "the prosecutor's comments to the jury that beyond any doubt the expert witness concluded that the weapon in custody is the murder weapon was improper and caused prejudice." (Traverse at p. 28.) The prosecutor stated as follows during his summation:

> There's every reason for you not to hear about physical evidence in the defense's case. It is beyond dispute in this case that the weapon that was recovered in the back of 128-130 North 3rd Street is the murder weapon beyond dispute.
>
> The reason it's beyond dispute is something that you should hear a little bit about, beyond the expert's testimony, but there's something that words do not express when the lieutenant testified when Lieutenant Burkuart testified to you he gave you the words of why he concluded without a doubt that the shell found right near where Mr. Ronald Wimbush was shot was absolutely fired from the weapon that was recovered.

(Dkt. No. 24-20 at p. 46.) During trial, the expert was asked, "within a reasonable degree of scientific certainty," whether the shell casing that was found was filed from the gun in question. (*See* Dkt. No. 24-16. at p. 52.) The expert stated that he had no doubt as to his conclusion that the shell casing found at the crime scene was fired from the gun in question. (*See id.*) Therefore, the prosecutor's statement about the expert's testimony in his summation did not misrepresent

the expert's testimony. Accordingly, petitioner failed to show that the prosecutor's commetns "so infected the trial with unfairness."

Additionally, petitioner contends in his traverse that the prosecutor's comments during summation that petitioner is a liar constituted prosecutorial misconduct. The prosecutor stated as follows in his summation:

> Clarence Scott is articulate, he is extraordinary intelligent. I don't think you can be put out by any kind of street language. Don't be fooled by then that Clarence Scott knows exactly what he was doing, he knew exactly what he was doing from that stand.
>
> So also keep in mind, but the style put that away. What is the substance of what is being said?
>
> As was pointed out this morning coincidences happen. Indeed, they do. To be able to conclude that Clarence Scott was not lying from the stand and the reason for lying is obvious because he killed a man, robbed two others, intent to try to kill police – the reason for those lies is underlying guilt. And the way he tries to run away from them is extraordinary series of coincidences, and you have to believe virtually every single coincidence one pile on top of the other pile, piled on top of the other pile, on top of the other to conclude that what he said to you was the truth because you are presented with two stark choices in this case. . . .
>
> He's on trial for murder. Hardly have to be told that a man on trial for murder has every reason to lie to you. He's had four years to consider his story. Four years. He's had the opportunity to listen to every other witness testify, virtually every other witness before him.

(Dkt. No. 24-20 at p. 47-48.)

A prosecutor is given wide latitude during closing arguments to ask the jury to draw inferences based on the evidence. *See United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991). Viewing the prosecutor's comments in the context of the entire summation and trial, the Court finds that the prosecutor's comments were not an inappropriate characterization of the evidence and did not rise to the level of prosecutorial misconduct. *Accord Gov't V.I. v. Edwards*, 233 F.

App'x 167, 173-74 (2007) (where prosecutor referred to defendant in closing argument as liar who used victim as "sex toy" and "sex slave," the "remarks were not an inappropriate characterization of the evidence before the jury.")  Indeed, as noted by the prosecutor during his closing argument, the jury was presented with two versions of the events that were mutually exclusive, so both versions of events could not be true.  (*See* Dkt. No. 24-20 at p. 48.)

ii.     *Hearsay Evidence from Robinson*

Petitioner also contends that the prosecutor committed misconduct by eliciting "double hearsay" evidence from Robinson that was prejudicial towards petitioner.  Petitioner relies on the arguments he made in *supra* Part IV.L.v, where he argued that the trial court should have instructed the jury not to consider testimony regarding Robinson's sister's fear of Petitioner.  However, Petitioner failed to show that the prosecutor's actions with respect to questioning Robinson on the incident involving his sister rendered his trial fundamentally unfair.  At the trial, Petitioner's counsel objected and the jury was sent out of the courtroom before the prejudicial testimony was heard.  Subsequently, the trial judge held that the evidence that he heard outside the presence of the jury would not be admissible at trial as its prejudicial effect outweighed its probative value.  Therefore, even if the prosecution engaged in misconduct by attempting to pursue this line of questioning, any misconduct was harmless as the jury never heard the prejudicial testimony.  Accordingly, this argument also does not merit federal habeas relief.

For these reasons, Claim XIII will be denied.

N.   Claim XIV – Failing to Questions Jurors about Extraneous Matters Influencing Verdict

In Claim XIV, petitioner argues that his rights to a fair trial and an impartial jury were violated when the trial court failed to question the jurors whether extraneous matters influenced their verdicts.  Specifically, petitioner asserts in his habeas petition that:

During deliberations, prior to reaching a verdict, the jury sent out a note, which the trial court had marked as exhibit C-12. This note was never disclosed to the defense. And the trial court did not voir dire the jurors regarding the contents of the note. The note was in fact discussed only during a post-verdict colloquy between the trial court and the jury, in the absence of the attorneys. During this colloquy, the trial court asserted that one or some of the jurors expressed fear of retaliation by petitioner because of the verdict, however, the exact contents of the note were not fully disclosed.

(Pet. at p. 34-35.)

After the verdicts were received and entered, the trial court received a juror note (C-12).[5]

(*See* Dkt. No. 24-23 at p. 46.) The trial court responded to the note as follows:

Let me tell you something else because I have a note from one of the jurors that we have marked C-12. This question about your names being used is not a new question. It's been raised before. It's something that has to be done in part of the process of having a public trial.

I started in the courthouse in 1967. I worked in the Prosecutor's Office for twenty-three years, was in court every single day, just about. I was the chief of the trial section for the last fifteen of those years before I became a judge eleven and a half years ago. So I have been here thirty-four years, I guess, something like that, in the courtroom almost every day.

I have never seen or heard of a case where there was some form of retaliation or effort to communicate with a juror after the verdicts were returned. I have heard of a couple of isolated incidents where there was some effort to communicate with a juror before the verdict was returned, but I'm dealing with thousands of cases that I have either personally handled or that came across my desk. And I have never heard of such a thing happening.

That's no guarantee that it won't happen, of course.

There is an office in the Prosecutor's Office, the Victim Witness Advocate Office, which, if you have some concern about, you should go directly there. It's on the sixth floor of the black building at 401 Grand Street. I have alerted them to this concern and they would process you through, depending on whatever it is

---

[5] Respondents did not attach a copy of trial Exhibit C-12 to the answer.

that happened or whatever your concern was about how to deal with that and what can be done about that.

Again, as I said, all someone does after the verdict is returned is expose themselves to some penalty for no reason. There's nothing to be accomplished once the verdict is returned. And it's almost unheard of even before a verdict is returned.

What I really want to say to you is this. What happened here in the courtroom was going to happen. I think Mr. Scott was going to do that sooner or later. He's right now serving a sentence of forty years, twenty without parole. The crimes that you didn't hear about that qualified him for that were three armed robberies and aggravated assault. So he is never going to be at liberty.

Your concern, I gather, would be about people who might be associated with him. And again, by reason of his being known to be out of circulation forever doesn't give him much clout anymore with people in the community, I would imagine.

Well, that's as much as I'll say about that.

Here is what really counts, ladies and gentlemen. You knew, when you got here, in the first ten minutes you keyed into at least three or four different things you could have said and walked out of here and not ever had to do this. You didn't do that. Most people don't do it. Very rarely do we see it happen. You know, you are sitting here looking at all of us but we are sitting here looking at you and it's a very encouraging thing to see this happen time after time, people come here and this kind of thing happens. You had a way to get yourself out of this. You didn't have to do this. This wasn't a little commitment, it was a lot to ask from you.

And I hope that what you'll take away from this experience is the gratification that you should have from having done that. Forget about how you decided the case, you certainly decided the case on a basis that's a well-founded and reasonable assessment of the evidence. But what's more important than that, I think, is the fact that you didn't run from this. This is not something people would volunteer to do or any of you might volunteer to do, but when it fell upon you, you didn't run from it. And I would want you to take that away from this experience, the gratification of having done that.

This is a public service. We asked a lot of you. I kept you late a lot of days. This was not an easy case. You listened carefully and

apparently you thought this through very carefully in the course of your deliberations, from what I could see and from your verdict. So I hope you'll take away from this experience the gratification of having served your community that way.

If any of you have any other questions of me and you want to stay, I'll talk to you about that if you have any concerns. I can understand, based upon what you have seen here during this trial, why you might feel some anxiety about that. My experience has been that there really is no basis to think that there is going to be any follow-up to the case, certainly not for jurors. But if you need some help and you want to stay, we'll see what we can do for you.

If you have a concern about that, I have already advised the Prosecutor's Office. I would report to the Victim Witness Advocate Office on the 6th floor of 401 Grand Street, the big black building next door here.

(Dkt. No. 24-23 at p. 48-52.)

During petitioner's post-conviction relief proceedings, the Superior Court discussed this issue as follows:

And I think the transcript pretty much puts this argument to rest. If you want to look at January 23rd and January 24th, of course these notes all through are given a Court Exhibit mark immediately as they come out of the Jury room as the sheriff's officer gives them to us. And let's see. So you can see as each one of them comes out you can track them through the transcript. It's the one from January 23rd. When they come out and I think that transcript ends – pardon me. I'm sorry. We've got C-8 if you look at Page 89. And I record when these notes come out and I say how I'm giving them to the Court Clerk to put in the Court file when I finish with them.

And then we go to January 24, 2002. That transcript, and you can see on Page 6, C-9, comes out – that's C-9 is the one where they ask for some clarification on felony murder. And then you see on Page 15 that – I refer to this earlier. It says "The Jury knocked with a verdict at 2:08 p.m." Okay. Now we haven't gotten C-12 yet.

And then the verdicts are being returned. And the defendant starts cursing. There's a lot of the "F" word here, but he's doing it in a very loud, threatening manner. Even scary. And then the Jurors

are asked to go back into the Jury room and the physical encounter occurs here. And it continues even after the defendant is taken into the security room. You can hear him out here. I even say this on the record. In a very loud voice, cursing, and threatening. And then I – we take the verdict and we give them a certain persons charge. Go through that. And then the verdict sheet is given on the certain persons charge. That's C-11. We still haven't gotten to C-12. But now the Jury has returned the verdicts on the indictment in chief, now they've been recharged, they deliberated, they returned a verdict on certain persons. That verdict sheet is marked C-11.

So now they go back into the jury room to await my brin[g]ing them out to give them their discharge instructions, which – and then they come out and I give them their instructions about whether if anyone approaches them and asks them about what went on during the case and so forth.

And what happened was when the Jury was coming out now after being discharged that's when I was handed the note C-12. And you see that now on the bottom of Page 48. It's a note that asks them or expresses some concern about their names being used, and why are names being used. And I go on I'm satisfied that their concerned about retaliation and I go on to tell them about that and why it would be very rare for that to happen after the verdicts are returned.

So I'm satisfied that that is not a note that – or that was presented at any time before the verdicts were returned. And may very well have been prompted by the defendant's threatening and physical confrontation here in the courtroom when he stood up and was cursing in a very loud voice, and turned the counsel table over, and then there was all the sheriff's officers involving in struggling with him. And physically he is – can be physically very threatening just by his size. I mean nothing else. He's very big and powerful.

So I don't – I'm not satisfied – I am satisfied that there is nothing at all to be concerned about with regard to that argument and that he has misrepresented the facts.

(Dkt. No. 24-25 at p. 16-17.) Petitioner then appealed his post-conviction relief petition to the

Appellate Division. That court discussed this issue as follows:

[D]efendant argues in his pro se supplemental brief that the jury was prejudiced by a note from a juror expressing personal safety

concerns that defendant might retaliate against the jury. The record shows defendant is factually mistaken. Defendant alleges the note was introduced prior to the verdict. However, the record clearly indicates that the note given to Judge Marmo before the verdict related to a question about the law concerning felony murder. A second note about a juror's concern for personal safety was indeed given to the judge, but it was after the verdict was announced. Thus, defendant's argument is without sufficient merit to warrant a written opinion.

(Dkt. No. 24-38 at p. 15.)

In denying this claim, the Appellate Division based its denial on the fact that petitioner was factually mistaken about the timing when the jury note was submitted to the court. The Superior Court, also based its decision on the fact that petitioner was factually mistaken about when the jury note was submitted to the court. By relying solely on the timing of the jury note, the state courts did not adjudicate petitioner's claim that the trial court should have questioned the jurors on whether extraneous evidence influenced their verdict.[6] Therefore, this Court will analyze petitioner's argument of jury biasness *de novo*.[7] *See Armann v. McKean*, 549 F.3d 279, 286 (3d Cir. 2008) (stating that where state courts fail to adjudicate claim on the merits, *de novo* review applies).

The Sixth Amendment guarantees a criminal defendant "the right to a . . . trial[ ] by an impartial jury." U.S. CONST. amend VI. This right is applicable to a defendant in state court through the Fourteenth Amendment. *See Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976). Jurors are presumed to be impartial. *See Irvin v. Dowd*, 366 U.S. 7171, 723 (1961). Furthermore, a defendant's right to "due process does not require a new trial every time a juror has been placed

---

[6] Petitioner's counseled appellate brief in his post-conviction relief proceedings argued both that "the trial court failed to timely inform counsel that a deliberating juror had expressed safety concerns," and that "Defendant was denied a fair and impartial jury due to the juror's fears." (Dkt. No. 24-35 at p. 40.)

[7] It is also worth noting that respondents expressly waived any lack of exhaustion argument with respect to petitioner's claims. (*See* Dkt. No. 27-1 at p. 43.)

in a potentially compromising situation. . . . Due process means a jury capable and willing to decide the case solely on the evidence before it[.]" *Smith v Phillips*, 455 U.S. 209, 217 (1982).

Courts have recognized that a trial court has the duty to conduct a hearing with respect to jury impartiality when there is evidence of extraneous influences on the jury. *See United States v. King*, 627 F.3d 641, 650 (7th Cir. 2010) ("A judge's duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.") (internal quotation marks and citation omitted); *United States v. Maye*, 241 F. App'x 638, 641 (11th Cir. 2007) ("[T]he district court abuses its discretion, or plainly errs, in failing to hold an investigatory hearing only when there is evidence that the jury was subjected to influence by outside sources.") (internal quotation marks and citation omitted); *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) ("Where a colorable claim of extraneous influence has been raised . . . a . . . hearing must be held to afford the defendant an opportunity to establish actual bias.") (internal quotation marks and citation omitted); *United States v. Thornton*, 1 F.3d 149, 155 (3d Cir. 1993) ("We have previously expressed a preference for individual juror colloquies [w]here there is a *significant possibility* that a juror . . .has been exposed to prejudicial *extra-record* information.") (internal quotation marks and citation omitted) (emphasis in original); *United States v. Watchmaker*, 761 F.2d 1459, 1465 (11th Cir. 1985) ("[T]he failure to hold a hearing constitutes an abuse of discretion only where there is evidence that the jury was subjected to influence by outside sources.") (citation omitted).  As the Third Circuit has noted, there is a key distinction between intra-jury communications and extra-jury influences as extra-jury influences "pose a far more serious threat to the defendant's right to be tried by an impartial jury." *See United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993).

Petitioner claims that the trial court had a duty to conduct a hearing once it received the note from the juror. The trial judge concluded that the note indicated a juror's generalized fear for his safety as the note inquired about the use of the juror's names. Several courts have analyzed whether a trial court errs in failing to conduct a hearing when the jury has expressed a generalized fear for their safety. For example, in *Thornton*, 1 F.3d at 155, jurors expressed "general apprehensiveness about their safety" during the course of the trial. At that time, defense counsel requested that the court conduct a colloquy to determine whether it would be impossible or difficult for them to be fair jurors in light of their fear. *See id.* The trial court decided not to conduct a colloquy. *See id.* On appeal, the defendants argued that the trial court should have conducted a colloquy to determine the jurors' basis for their apprehension. *See id.* In analyzing this issue, the Third Circuit noted that nothing in the jury's statement indicated that they had been exposed to "extra-record information." *See id.* The Third Circuit further explained that in such situations, the trial judge's discretion concerning whether to hold a colloquy is "especially broad" because "[a] trial judge is usually well-aware of the ambience surrounding a criminal trial and the potential for juror apprehensions." *Id.* (citation omitted). Ultimately, the Third Circuit determined that the failure to conduct a colloquy was not an abuse of discretion as the trial court had weighed the opposing interests and concluded that voir dire would make the problem worse. *See id.* at 156.

A similar issue arose in *Garcia v. Andrews*, 488 F.3d 370 (6th Cir. 2007). In that case, a juror in petitioner's state trial had expressed concern during the course of the trial for his and his family's safety because he worked in the immediate area of the burnt out home and because the defendant's family owned property nearby and could easily identify him.[8] *See id.* at 372. The

---

[8] The petitioner in *Garcia* was convicted of aggravated arson and insurance fraud, among other claims. *See* 488 F.3d at 371.

record did not indicate that the juror knew the defendant or his family personally. *See id.* Nevertheless, defense counsel requested a "mistrial, or in the alternative, for the trial court to *voir dire* the jury to determine the existence or extent of any taint." *Id.* at 372-73. The trial court denied the motion for a mistrial and request for *voir dire*.

In analyzing petitioner's habeas petition, the Sixth Circuit noted that the leading case in this area was *Remmer v. United States*, 347 U.S. 227 (1954). In *Remmer*, after the jury had returned its verdict, the petitioner learned for the first time that a person had communicated with a juror who had become the jury foreman that he could profit by returning a verdict favorable to petitioner. 347 U.S. at 228. The juror reported the incident to the judge who informed the prosecutor and the Federal Bureau of Investigation ("FBI"). *See id.* The FBI issued its report to the judge and the prosecutors alone who "apparently concluded that the statement to the juror was made in jest." *Id.* The Supreme Court noted that:

> [i]n any criminal case, any private communication, contact, or
> tampering directly or indirectly, with a juror during a trial about
> the matter pending before the jury is, for obvious reasons, deemed
> presumptively prejudicial, if not made in pursuance of known rules
> of the court and instructions and directions of the court made
> during the trial, with full knowledge of the parties.

*Id.* at 229. Ultimately, the Supreme Court remanded the matter back to the district court "to hold a hearing to determine whether the incident complained of was harmful to the petitioner, and if after the hearing it is found to have been harmful, to grant a new trial." *Id.* at 230.

Even considering *Remmer*, the *Garcia* Court denied habeas relief because there was no evidence of extrinsic influence on the juror. *See* 488 F.3d at 376. The Sixth Circuit reasoned that there is no Supreme Court precedent requiring a *Remmer* hearing when there is no evidence of extraneous contact with the juror. *See id.* at 377.

Finally, in *King*, 627 F.3d at 650, a jury note stated that some jurors had concerns regarding their personal safety and security. The defendant argued that the trial court acted improperly in denying his motion for a new trial because he did not question the jurors. *See id.* at 650-51. The Seventh Circuit ultimately determined that the district court properly denied the motion for a new trial because nothing in the jury note suggested exposure to outside influences, and the jurors fears likely originated from defendant's membership in a gang which was already in evidence at trial. *See id.* at 650-51.

As these cases indicate, the key issue in determining whether the trial court should conduct a hearing on potential juror taint issues is whether the jury has been exposed to extraneous information. The record in this case does not show that petitioner argued in state court that the jury was influenced by outside sources. Instead, he argued that the juror note itself required the trial court to conduct a colloquy. The trial judge indicated that the juror note related to a question regarding the necessity of their names being used. The trial judge took this question to mean that the juror was afraid for his safety. As the cases cited above indicate, the jury note, without any evidence of extraneous information being supplied to the jury, does not entitle petitioner to a hearing. Indeed, as the Third Circuit noted in *Thornton*, in such a situation, the trial judge is afforded "especially broad" discretion in such circumstances concerning whether to conduct a hearing. *See* 1 F.3d at 155.

Nevertheless, in his traverse, petitioner argues that the jury in fact was exposed to extraneous information from Sergeant J. Brady. Specifically, he contends as follows:

> Petitioner's claim of an active witness against petitioner (Sgt. J. Brady) (Passaic county sheriff Dept.) of an indictment that included possession of alleged gang paraphernalia and conspiracy to escape, was the only way this concern of petitioner's alleged association with gangs was revealed to the jury. No testimony within petitioner's trial court expressed gang activity. The only

alleged concern of gang activity was expressed to [the] trial court privately by Sgt. J. Brady and staff somehow due to no record of such.

Petitioner's claim is [that] this extraneous evidence was introduced by the Sgt. J. Brady [while he was] assisting in escorting the jury to and from the parking lots and working within petitioner's trial court sessions even when he was not assigned as the Passaic County employee roster indicates.

(Dkt. No. 28 at p. 28.)

In *United States v. Lloyd*, 269 F.23d 228 (3d Cir. 2001), the Third Circuit analyzed the sanctity of jury principles, and discussed that exposure to extraneous information may warrant further inquiry:

As this court recently discussed in *Wilson*, we do not permit jurors to impeach their own verdicts. *See* [*Wilson v. Vermont Castings, Inc.,*170 F.3d [391,] 394 [(3d Cir. 1999)]. "The purpose of this rule is to promote finality of verdicts, encourage free deliberations among jurors, and maintain the integrity of the jury as a judicial decision-making body." *Id.* As an opinion from the Sixth Circuit recently stated, "[i]f . . . courts were to permit a lone juror to attack a verdict through an open-ended narrative concerning the thoughts, views, statements, feelings, and biases of herself and all other jurors sharing in that verdict, the integrity of the American jury system would suffer irreparably." *United States v. Gonzales*, 227 F.3d 520, 527 (6th Cir. 2000). Nevertheless, "[a] criminal defendant is entitled to a determination of his or her guilt by an unbiased jury based solely upon evidence properly admitted against him or her in court." *Virgin Islands v. Dowling*, 814 F.2d 134, 138 (3d Cir. 1987). . . .

Thus, a court may inquire into the verdict if "extraneous prejudicial information was improperly brought to the jury's attention of [if] any outside influence was improperly brought to bear upon any juror. *Wilson*, 170 F.3d at 394. However, "the court may only inquire into the existence of extraneous information," and not "into the subjective effect of such information on the particular jurors." *Id.*

*Lloyd*, 269 F.3d at 237 (internal citations omitted). However, the Third Circuit has been hesitant to generally authorize the post-trial probing of jury verdicts:

> We are always reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.' As we have said before, post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts.

*United States v. Gilsenan*, 949 F.2d 90, 97 (3d Cir. 1991) (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (omitting citations)). Thus, the Third Circuit has explained that, "'[t]he duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.'" *United States v. Anwo*, 97 F. App'x 383, 387 (3d Cir. 2004) (quoting *Ianniello*, 866 F.2d at 543 (citations omitted)). "Specifically, 'a post-trial jury hearing must be held when a party comes forward with clear, strong, substantial and incontrovertible evidence . . . that a specific, non-speculative impropriety has occurred[.]'" *Id.* (citing *Ianniello*, 866 F.2d at 543 (citations omitted)).

In this case, petitioner only presents speculative evidence to support his argument that the jury was exposed to extraneous information. Indeed, petitioner only speculates that Sgt. J. Brady, while he was escorting the jury to and from the parking lots, expressed to the jury that petitioner was involved in a gang. This falls short of establishing "clear, strong, substantial and incontrovertible [extraneous] evidence" that required the state court to conduct a hearing. *Accord Anwo*, 97 F. App'x at 387 (finding that the district court did not abuse its discretion by declining to voir dire jurors post-trial when petitioner only offered speculation of identity of courtroom observer, the periods of time she was in the courtroom, and the nature of her relationship and conversations with certain members of the jury); *United States v. Fumo*, 639 F. Supp. 2d 544, 551-52 (E.D. Pa. 2009) (noting that defendant's hearing request "is precisely the sort of 'fishing expedition' against which our jurisprudence has cautioned."), *aff'd*, 655 F.3d 288

(3d Cir. 2011).  Therefore, petitioner fails to show that he was entitled to a post-verdict jury hearing.  Accordingly, for the foregoing reasons, Claim XIV will be denied.

O.  Claim XV – Ineffective Assistance of Appellate Counsel

In Claim XV, petitioner claims that appellate counsel was ineffective for failing to raise Claims IV – XIV on direct appeal.  Petitioner raised this issue in his post-conviction relief proceeding.  The last reasoned decision on this claim was from the Superior Court which denied it as follows:

> And then he goes on to say in No. 13 that the appellate counsel misrepresented him or did not properly represent him on appeal. He did file his own pro se on appeal however.  So whatever things he wanted the Appellate Division to know about he certainly presented them in his own brief to the Appellate Division.

> And I'm looking at the brief that was submitted on appeal.  It looks like a brief that is done in a competent manner.  He doesn't indicate to me what things specifically the appellate counsel didn't bring to the Court's attention that the appellate – that she should have.

(Dkt. No. 24-25 at p. 17-18.)

Claims of ineffective assistance of appellate counsel are evaluated under the same *Strickland* standard as is applicable to trial counsel.  *See Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004).  The Court has analyzed Claims IV to XIV on the merits, and has determined that petitioner is not entitled to federal habeas relief on any of these claims.  Petitioner was permitted to raise Claims IV – VII on direct appeal in a supplemental brief.  Thus, petitioner fails to show how he was prejudiced by appellate counsel's failure to raise these issues.  As to petitioner's remaining claims, this Court has determined that none of them warrant relief.  Therefore, petitioner has again failed to show that he was prejudiced.  Accordingly, Claim XV will be denied.

## V.    MOTION FOR EVIDENTIARY HEARING

Petitioner has filed a motion for an evidentiary hearing.  (*See* Dkt. No. 29.)  "[I]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citation omitted).  This has been interpreted "to require a petitioner to make a prima facie showing that would entitle [him] to prevail on the merits of the asserted claim."  *Morris v. Beard*, 633 F.3d 185, 196 (3d Cir. 2011) (internal quotation marks and citation omitted).  Moreover, the Supreme Court has held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has not bearing" on such review.  *Pinholster*, 131 S. Ct. 1388, 1398, 1400 (2011).  In this case, an evidentiary hearing is not warranted for the reasons expressed in Part IV, *supra*, as none of Petitioner's substantive claims have merit.

## VI.    APPOINTMENT OF COUNSEL

State court prisoners like petitioner do not have a constitutional right to counsel in habeas proceedings.  *See Reese v. Fulcomer*, 946 F.2d 247, 263 (3d Cir. 1991).  However, 18 U.S.C. § 3006A(a)(2)(B) provides that the court has discretion to appoint counsel where "the court determines that the interests of justice so require . . ."  In *Reese*, the Third Circuit explained that in determining whether counsel should be appointed, a court "must first decide if the petitioner has presented a nonfrivolous claim and if the appointment of counsel will benefit the petitioner and the court.  Factors influencing a court's decision include the complexity of the factual and legal issues in the case, as well as the pro se petitioner's ability to investigate facts and present

claims." 946 F.2d at 264. In this case, the Court finds that the appointment of counsel is not warranted.

## VII. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, the Court finds that a certificate of appealability shall not issue in this case.

## VIII. CONCLUSION

For the foregoing reasons, the habeas petition will be denied and a certificate of appealability shall not issue. An appropriate order will be entered.


　　　　s/Stanley R. Chesler　　　
STANLEY R. CHESLER
United States District Judge

DATED: August 27, 2013